Opinion
 

 LORING, J.
 
 *
 

 —Arthur Brownlee (Brownlee) was charged by information with four counts of burglary in violation of Penal Code section 459 and one count (count V) of attempted burglary in violation of Penal Code section 664/459. He was also charged with conviction of four prior felonies, forgery, grand theft and two convictions for burglary.
 
 [1]
 
 Brownlee was found guilty on counts I, IV and V and acquitted on counts II and III. Count I charged burglary of the house of Carl Mathis on May 10, 1976. Count IV charged burglary of the home of Emil John King on June 9, 1976, and count V charged the attempted burglary of the house of Elwin Raikes on June 15, 1976. Brownlee was represented by Michael O. Clark, deputy public defender, at the arraignment, all pretrial motions and until the third day of trial. Pretrial motions to dismiss for lack of prosecution, for denial of speedy trial and motion under Penal Code section 1538.5 to suppress certain evidence, allegedly illegally seized incident to arrest, were denied. On the third day of trial (Jan. 11, 1977) the court denied Brownlee’s motion for a continuance until he could employ private counsel to represent him but did grant Brownlee’s motion to discharge Michael O. Clark as his attorney and to appear thereafter as his own lawyer. On the fourth day of trial (Jan. 12, 1977) Brownlee voluntarily walked out of the courtroom and into the holding cell adjacent to the courtroom, refusing to participate further in the trial. The court reappointed Michael O. Clark as Brownlee’s attorney. On the sixth day of trial (Jan. 14, 1977) the jury returned guilty verdicts on counts I, IV and V. Brownlee’s motion for a new trial and application for probation were denied. Brownlee was sentenced to serve the time prescribed by law, but the written judgment provided that he be sentenced to the California Institution for Men for the term prescribed by law. (We will hereafter modify this clerical error.) The sentences were ordered to run concurrently. Brownlee appeals from the judgment.
 

 
 *925
 
 Issues
 

 Appellant contends:
 

 I. The trial court erroneously—
 

 (a) denied his motion under Penal Code section 1538.5 to suppress certain evidence;
 

 (b) denied his motion to compel disclosure of the identity of an untested informant;
 

 (c) denied his motion for a mistrial when his pro. per. status was revoked and the public defender was reappointed to defend Brownlee.
 

 II. That he did not make a knowing and intelligent election to represent himself.
 

 Facts
 

 A.
 
 Facts Established on Section 1538.5 Motion to Suppress
 

 Police Officer Thomas Purington testified that several days prior to June 21, 1976, an untested informant told him that Brownlee was committing burglaries on a daily basis; that the stolen property was taken to a residence at 1446 West 65th Place from which address the stolen property was sold. The informant told Purington that two other men, one of whom was named Cyril, lived at the same address; and that Brownlee drove a 1966 Chevrolet, license RTE 557. Thereafter Purington maintained surveillance of the house at 1446 West 65th Place where he saw the 1966 Chevrolet, license No. RTE 557, in the driveway, and he saw Cyril Jordan leave the house. He saw Brownlee leave the house, enter the Chevrolet and drive away. Thereafter, Purington discovered from police and sheriff’s records that there were three arrest warrants outstanding for Brownlee; that he had been sent to prison for burglary; that he was then on parole; and that he had escaped from law enforcement officers.
 

 He also received information regarding the various types of property that Brownlee was “dealing in or taking from the residence[s]” which
 
 *926
 
 were “Basically household items, TV, stereos, typewriters, cameras, clock radios, clothing, coins, jewelry.”
 
 [2]
 

 On June 21, 1976, Purington, with several other officers at least one of whom (Officer Iannessa) was in uniform,
 
 [3]
 
 went to 1446 West 65th Place. The front door was open but the screen door was closed. As Purington approached the front door from the outside, a man subsequently identified as “Mr. Perkins” approached the door from inside the house so that Perkins was standing at the screen door when Purington arrived in front of it. Purington told Perkins that he was a police officer; that he had a warrant for the arrest of Brownlee and asked him to open the door. (Actually Purington or other officers with him then had in their possession three warrants for the arrest of Brownlee, one for burglary, one for grand theft auto, and one for “8EW” [sic ADW?].) Perkins opened the screen door and stepped back into the living room. Purington and other officers entered. Brownlee was lying on a couch in the living room. Purington identified Brownlee, from photographs which were in Purington’s possession. Purington showed Brownlee a copy of the warrant and placed him under arrest. Purington knew there were three men living at that address and he “checked the remainder of the house for the third person.” He testified that he wanted to “maintain control” over the third person (in addition to Brownlee and Perkins) “for officer safety.” In walking down the hallways of the house searching for the third person, Purington glanced into the east and west bedrooms and saw in plain view a great many items of personal property which seemed to fit the descriptions of the stolen property. Purington returned to the front room, advised Perkins of his
 
 Miranda
 
 rights, which Perkins waived, and Purington asked Perkins for permission to search his bedroom. Perkins replied that he used the west bedroom and Jordan used the east bedroom. Perkins granted Purington permission to search the west bedroom. Purington entered the west bedroom and removed items of personal property which seemed to fit the descriptions of stolen property and took them into the living room. At that point Jordan arrived at the house. Purington identified himself, advised Jordan that Brownlee had
 
 *927
 
 been placed under arrest on several warrants, that he had information that Brownlee had been committing burglaries and bringing stolen property into the house. Purington advised Jordan of his
 
 Miranda
 
 rights, which Jordan waived. Purington asked Jordan to explain the presence of the apparently stolen property. Jordan replied that the house was his and he would have to take the blame for it. Jordan said the items in the east bedroom had been brought in by Brownlee. Purington requested and Jordan granted permission to search the house. Purington did so, recovering many items of personal property, which fit the descriptions of property which had been stolen. Purington exited the house to seize the Chevrolet, license RTE 557 which had also been reported stolen. In the open garage, Purington saw other items of personal property which fit the descriptions of stolen property which was seized. In the Chevrolet Purington found a pair of channel lock pliers wrapped in a cloth. Brownlee had used a pair of channel lock pliers in several of the burglaries.
 

 Most of Purington’s testimony was denied by Brownlee who testified in support of the section 1538.5 motion to suppress. Brownlee called other officers as his witnesses.
 

 The trial court indicated that in its opinion the main issue on the section 1538.5 motion was the issue of consent; the court concluded that the “walk through” by Purington was lawful since Purington had reasonable grounds for believing that the third person (Jordan) was present. The court found that the two persons, Perkins and Jordan, “did give valid consents for the search.” The court concluded that the officers were truthful and Brownlee was not. The court said; “I have to say that Jordan and Perkins did consent to the searches and that those consents were not tainted by the fact that the officers had already seen bad things that they possessed in their search for the possible missing Jordan at that time.”
 

 The section 1538.5 motion was denied.
 

 B.
 
 Facts at Trial
 

 Substantially the same testimony was given by Purington at trial. In addition the People presented testimony by Carl Mathis (in regard to count I) whose home was burglarized on May 10, 1976, and various items of personal property were stolen, including a trumpet which was rented by Mathis from the Los Angeles City School System and which was
 
 *928
 
 recovered by police from the residence at 1446 West 65th Place. One of Brownlee’s fingerprints was lifted from a louvered window pane which the burglar removed from a window in the Mathis residence.
 

 Emil John King and his daughter Karen King testified (in regard to count IV) that various items of personal property were stolen from their residence on June 9, 1976, which were never recovered. David Trotochau who lived five houses down the street from King testified that on June 9, 1976, he saw Brownlee knock on the door of his own house and several other houses on the same street; that he saw Brownlee enter the King residence and exit with a pillowcase full of objects, one of which appeared to be a portable TV set. Trotochau saw Brownlee put the pillowcase full of objects in a white Chevrolet with black vinyl top, license number RTE 557.
 

 Elwin Raikes testified (in regard to count V) that on June 15, 1976, when he returned home he found that the doorknob on the rear door of his house was completely crushed but not broken off. Nothing had been stolen from the house.
 

 John Cantwell, who lived across the street from Raikes, testified that on June 15, 1976, he saw Brownlee drive up in front of the Raikes’ residence in a Chevrolet license number RTE 557, park, go to the front door of the Raikes’ residence, ring the doorbell, wait five or six minutes and then go to the rear of the Raikes’ residence from which he returned in about ten minutes and drove away in the Chevrolet.
 
 [4]
 

 All of the residences which were burglarized by Brownlee and referred to in counts I through V were within two miles of each other “as the crow flies.”
 

 Discussion
 

 A.
 
 The Denial of the Section 1538.5 Motion to Suppress
 

 Although not stated as a separate contention, Brownlee contends that Purington failed to comply with the “knock and announce”
 

 
 *929
 
 requirement of Penal Code section 844. There was substantial evidence from which the trial court could conclude that Purington properly identified himself to Perkins as a police officer and properly stated the purpose of his visit which was to arrest Brownlee on three arrest warrants then in the possession of Purington or other officers present. The court could conclude under the circumstances that the front door was open and Perkins was standing at the screen door and engaged Purington in conversation; that “knocking” would have been an act of redundancy which was wholly unnecessary. The purpose of “knocking” is to get the attention of someone in the house and to thereby induce them to come to the door. The object of knocking had been achieved when Perkins stood at the open door. The trial court could and did properly conclude that there was a legally sufficient compliance with the requirements of Penal Code section 844.
 
 (People
 
 v.
 
 Marshall
 
 (1968) 69 Cal.2d 51, 55-56 [69 Cal.Rptr. 585, 442 P.2d 665];
 
 People
 
 v.
 
 Rosales
 
 (1968) 68 Cal.2d 299, 302 [66 Cal.Rptr. 1, 437 P.2d 489];
 
 People
 
 v.
 
 Hill
 
 (1971) 19 Cal.App.3d 306, 318 [96 Cal.Rptr. 813];
 
 People
 
 v.
 
 Stephens
 
 (1968) 266 Cal.App.2d 661, 665 [72 Cal.Rptr. 317].)
 

 There was substantial evidence to sustain the trial court’s finding that Perkins and Jordan knowingly, freely and voluntarily consented to the search of the residence at 1446 West 65th Place. The findings of the trial court will not be disturbed on appeal when they are based on substantial evidence.
 
 (People
 
 v.
 
 Gale
 
 (1973) 9 Cal.3d 788, 792 [108 Cal.Rptr. 852, 511 P.2d 1204];
 
 People
 
 v.
 
 Lawler
 
 (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621];
 
 People
 
 v.
 
 Superior Court (Peck)
 
 (1974) 10 Cal.3d 645, 649 [111 Cal.Rptr. 565, 517 P.2d 829];
 
 People
 
 v.
 
 West
 
 (1970) 3 Cal.3d 595, 602 [91 Cal.Rptr. 385, 477 P.2d 409].
 

 B.
 
 Refusal to Compel Disclosure of Informant
 

 Brownlee contends that under
 
 Priestly
 
 v.
 
 Superior Court
 
 (1958) 50 Cal.2d 812 [330 P.2d 39], he was entitled to know the identity of the informant because Purington relied on information supplied by the informant to justify the “walk through” search of the residence at 1446 West 65th Place in search of the third person (Jordan) and that consequently without such information from the informant, Purington would have been guilty of an illegal search.
 

 The argument overlooks the fact that Purington had the residence at 1446 West 65th Place under surveillance for several days, saw Jordan
 
 *930
 
 leave and was aware of Jordan’s presence at the residence from information other than that which was supplied by the informant.
 

 It is incumbent on Brownlee to justify the request for disclosure of the identity of the informant by showing that there is a reasonable possibility that the informant could produce evidence establishing his innocence.
 
 (Honore
 
 v.
 
 Superior Court (1969)
 
 70 Cal.2d 162, 168 [74 Cal.Rptr. 233, 449 P.2d 169];
 
 People
 
 v.
 
 Garcia
 
 (1967) 67 Cal.2d 830, 839-840 [64 Cal.Rptr. 110, 434 P.2d 366];
 
 People
 
 v.
 
 Long
 
 (1974) 42 Cal.App.3d 751, 755 [117 Cal.Rptr. 200];
 
 People
 
 v.
 
 Sewell
 
 (1970) 3 Cal.App.3d 1035, 1039 [83 Cal.Rptr. 895].) Here Brownlee argues that the informant must have seen the inside of the residence at 1446 West 65th Place from which he speculates that maybe the informant could testify that the stolen property was really in the possession of Jordan or Perkins. Even Brownlee’s speculation is wide of the mark. He was convicted of two counts of burglary and one of attempted burglary by eyewitness testimony of Trotochau and Cantwell who observed the actual burglaiy alleged in count IV and the attempted burglary alleged in count V, and the fact that his fingerprint was found on a louvered window at the residence of Mathis referred to in count I. Brownlee was not charged with receiving or possessing stolen property, and it would be completely irrelevant whether or not Jordan or Perkins had possession of the loot. The fact that Brownlee was apprehended at the residence where the loot was recovered merely justified an inference that that was the point to which he delivered the loot after the burglaries. Whether he then continued to possess it or gave it away or sold it to others would be irrelevant to the charge of burglary which was complete as soon as Brownlee entered the victims’ residences with the requisite criminal intent.
 
 (People
 
 v.
 
 Walters
 
 (1967) 249 Cal.App.2d 547, 550 [57 Cal.Rptr. 484];
 
 People
 
 v.
 
 Mitchell
 
 (1966) 239 Cal.App.2d 318, 328 [48 Cal.Rptr. 533].)
 

 Brownlee did not establish in the trial court and has not established here that the disclosure of the identity of the informant would have led to the discoveiy of evidence which might have been beneficial to any possible defense. Consequently the trial court did not abuse its discretion in denying the motion. No prejudice is shown in any event since the evidence of guilt was overwhelming.
 

 C.
 
 The Denial of the Motion for a Mistrial
 

 As already noted, on the third day of trial, the trial court granted defendant’s request that he be substituted in propria persona in place of
 
 *931
 
 the deputy public defender (Michael O. Clark) who had represented him continuously up to that point. The request was granted by the court apparently out of an abundance of caution and a belief apparently induced by Clark that Brownlee had an unqualified constitutional right under
 
 Faretta
 
 v.
 
 California
 
 (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], to serve as his own counsel even when the request was first made while the trial was in actual process.
 
 [5]
 
 On the fifth day of trial, Brownlee announced that he would no longer participate in the trial and walked out of the courtroom into an adjacent holding cell. Thereafter Brownlee refused to voluntarily walk into the courtroom and the bailiff had to cany him into the courtroom and lay him on the floor while the court considered the advisability of reinstating Clark as Brownlee’s attorney of record. The record is clear that Brownlee’s further presence in the courtroom was only under the compulsion of superior force. After Clark was reappointed as counsel for Brownlee without Brownlee’s consent, Clark made a motion for mistrial which was denied. Brownlee now argues that the reappointment of Clark violated principles enunciated in
 
 People
 
 v.
 
 Manson
 
 (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265], where Van Houton’s lawyer, Ronald Hughes, failed to appear after the close of evidence and prior to jury argument and Maxwell Keith was substituted in his place. Brownlee argues here that Clark, like Keith in
 
 Manson,
 
 could not argue the credibility of witnesses whose testimony he had not heard and that therefore like Van Houton he is entitled to a reversal. The argument is too simple and ignores controlling facts which distinguish
 
 Manson.
 
 In
 
 Manson
 
 neither Hughes nor Van Houten were responsible for the disappearance of Hughes. Subsequent events established that Hughes had died accidentally. In the case at bar, Brownlee was solely responsible for his absence from the courtroom. Once Brownlee arbitrarily and without legal justification refused to participate any further in the trial, the court provided the best solution which was available-to it under the circumstances, which was to reappoint Clark.
 
 [6]
 
 In
 
 Manson
 
 Keith had no prior contact with the case. In the case at bar, Clark had prepared the case for trial, had tried the section 1538.5 motion to suppress, and was thoroughly familiar with all of the evidence and the law. Unlike Keith, Clark did not re-enter this case “cold.” Clark represented to the court at the outset of trial that he was thoroughly familiar with the case and prepared for trial.
 

 
 *932
 

 Faretta
 
 recognized the right of the court to terminate a defendant’s right to represent himself when he abuses the privilege and engages in serious and obstructionist misconduct. It is difficult to imagine a more effective way to bring the wheels of justice to a complete grinding halt than for a pro. per. defendant to refuse to enter the courtroom as Brownlee did in this case, which undoubtedly is precisely why Brownlee did what he did. But no court of justice, worthy of the name, can allow its legitimate function to be stopped by such a maneuver. If we were to countenance this kind of conduct by Brownlee and reverse this judgment on this ground, it is not difficult to imagine the mass exodus of all pro. per. defendants from all criminal trials. We are aware of no principle of law, constitutional or otherwise, which entitles a defendant to a mistrial for his own misconduct.
 

 Assuming without deciding that the appointment of Clark was error,
 
 [7]
 
 it was error which Brownlee invited by voluntarily and without any legal justification absenting himself from the courtroom while the trial was in process. No appellant can complain of error which he has invited by his own conduct. “Where a party by his conduct
 
 induces the commission of error,
 
 he is
 
 estopped
 
 from asserting it as a ground for reversal. . . .” (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, Theory of Invited Error, § 266, p. 4257.)
 

 Furthermore, we conclude that the appointment of Clark was nonprejudicial in any event for two basic reasons: (1) Brownlee argues that Clark could not
 
 competently
 
 serve as his lawyer
 
 since he
 
 had not heard the witnesses who had testified in his absence a la
 
 Manson.
 
 We think Brownlee uses the wrong yardstick. The question is not whether Clark could do a competent job—the question is rather whether Clark did more damage and caused more prejudice than if no lawyer had been appointed at all. For if Clark had not been appointed, Brownlee would have been without any lawyer in the courtroom, because Brownlee refused to enter the court at all, either as defendant or as defendant in propria persona. His assumption that the court should have stopped functioning entirely displays unjustified optimism, because it is not supported either by constitutional principle or common sense. The trial court had not only the right but an obligation to proceed. Clark was manifestly more competent to continue with the case than any other
 
 *933
 
 lawyer would have been, since no other lawyer had any connection with the case whatsoever. Prior to his removal and reappointment, Clark represented to the court that he was “thoroughly familiar with the case.” There is no showing of prejudice from the fact that Brownlee received the benefit of Clark’s services rather than the service of no lawyer at all, or the service of a lawyer who had no knowledge of the case. (2) The contention that Clark could not effectively argue the credibility of witnesses who testified in his absence
 
 [8]
 
 is disproven by the fact that he secured an acquittal of Brownlee on counts II and III and the victims of those charges, Mrs. Baggs and Mr. and Mrs. Petrangelo, testified during the absence of Clark from the trial.
 

 We conclude that the trial court did not commit error in denying Brownlee’s motion for mistrial and that the appointment of Clark was nonprejudicial under the unique circumstances of this case.
 

 D.
 
 The Granting of Brownlee’s Request that He Act as His Own Lawyer
 

 Brownlee contends that the court erroneously granted his request that he act as his own lawyer because, he (Brownlee) did not make a knowing and intelligent waiver of his constitutional right to be represented by counsel. We conclude that the contention is devoid of merit for at least two reasons: (1) The record discloses a knowing and intelligent waiver and, (2) Brownlee’s lawyer (Clark) represented to the court that Brownlee had an absolute constitutional right to act as his own lawyer, and the error, if any, in appointing Brownlee to act as his own lawyer comes within the doctrine of invited error.
 

 We are not here dealing with a first time offender who had no previous experience in courtrooms. Brownlee had been convicted of four prior crimes. These prior crimes resulted in judgments dated October 27, 1969, October 7, 1971, October 27, 1972, and June 27, 1974. Brownlee therefore presumably had been through the trial court process on four prior occasions. He was no stranger to the courtroom. He was on parole at the time of his arrest on June 21, 1976. That Brownlee understood fully the gravity and risk of appearing as his own lawyer and waiving his constitutional right to counsel is manifested by the court’s statement to him that pro. per. defendants “make mistakes” and by his statement to the court “. . . I realize I am not capable of doing so . . .” [to serve as his
 

 
 *934
 
 own lawyer], Brownlee’s statements to the court demonstrated considerable familiarity with the law referring to
 
 Beagle, Rist, Priestly
 
 and other well known cases. He also advised the court that he “had to request [of Clark] all of the motions that were made so far.”
 

 The test under
 
 Fáretta
 
 is not whether the defendant is competent to act as his own lawyer but whether he “knowingly” waives his constitutional right to counsel with a realization of the probable risk and consequetices. It is clear here that Brownlee waived his right to counsel “with eyes open.”
 
 (United States
 
 v.
 
 Plattner
 
 (2d Cir. 1964) 330 F.2d 271, 276.)
 

 If court and counsel had been aware on January 11, 1977, that the California Supreme Court would decide
 
 People
 
 v.
 
 Windham, supra,
 
 19 Cal.3d 121, on March 15, 1977, the trial court would undoubtedly have denied Brownlee’s motion on January 11, 1977, to act as his own lawyer. Brownlee first requested the substitution of private counsel for the deputy public defender. The court said that the motion came “in the middle of a trial and this motion comes very late in time to be expected to have it be granted” and that the court “just can’t delay this trial by that motion coming in as it does at this time.” Clark represented and argued to the court that Brownlee “does have an absolute constitutional right to defend himself’ and that in his opinion “Mr. Brownlee is capable and competent to represent himself’ and that . . under the Feretta [s/c] decision Mr. Brownlee has an absolute right to defend himself. . .” and that “[T]he sole determination is whether your Honor feels Mr. Brownlee is competent to defend himself.” The record is clear that the court was induced (against its better judgment) to relieve Clark as counsel for Brownlee and to allow Brownlee to act as his lawyer because Brownlee’s lawyer Clark represented that Brownlee had an absolute constitutional right to serve as his own lawyer even when the request is first made after the commencement of trial. But for such erroneous representation of law,
 
 [9]
 
 the court may well have denied Brownlee’s request as untimely. We conclude that Brownlee’s lawyer induced the court to allow Brownlee to act as his own lawyer. Consequently, assuming without deciding that the order allowing Brownlee to act as his own lawyer was erroneous, it was error which Brownlee invited. He may not complain in this court of error which he induced the trial court to commit.
 

 
 *935
 
 Since the written judgment of the trial court should have sentenced Brownlee to state prison for the term prescribed by law, rather than to California Institution for Men
 
 (People
 
 v.
 
 Thomas
 
 (1976) 65 Cal.App.3d 854, 858 [135 Cal.Rptr. 644]), the written judgment will be modified accordingly.
 

 The judgment is modified by deleting therefrom all reference, to the “California Institution for Men” and substituting in lieu thereof the words “imprisonment in State Prison” and, as so modified, the judgment is affirmed.
 

 Allport, Acting P. J., and Potter, J., concurred.
 

 *
 

 Assigned by the Chairperson of the Judicial Council.
 

 [1]
 

 During trial the court granted a motion to strike the allegations regarding one prior conviction of burglary.
 

 [2]
 

 The record is unclear as to whether this information came from the untested informant or police records. However, in view of the testimony produced at trial, it could have come from police records since eyewitness reports of burglaries by a person of Brownlee’s description, driving a Chevrolet, license RTE 557, had been reported to police prior to June 21, 1976. The eyewitnesses had identified photographs of Brownlee prior to June 21, 1976.
 

 [3]
 

 At trial Purington testified that there were a total of six officers two of whom were in uniform.
 

 [4]
 

 We disregard evidence presented by the People in support of counts II and III, since Brownlee was acquitted on those charges. However, such evidence did establish that items of personal property stolen from those victims were recovered from the residence at 1446 West 65th Place.
 

 [5]
 

 This case was tried on January 7, 10, 11, 12, 13 and 14, 1977. On March 15, 1977, the California Supreme Court decided
 
 People
 
 v.
 
 Windham,
 
 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187], which held that the court could properly deny as untimely such a request when made after the commencement of trial.
 

 [6]
 

 Apparently Clark was in the court house on other business when the problem arose and the court sent the bailiff after him.
 

 [7]
 

 We have absolutely no doubt that the reappointment of Clark was authorized by principles enunciated in
 
 Faretta.
 

 [8]
 

 Clark was supplied with a transcript of their testimony.
 

 [9]
 

 We do not suggest or insinuate that Clark was either incompetent or dishonest. He was not aware of the March 15, 1977, decision of the Supreme Court in
 
 Windham
 
 either.