[Crim. No. 28813. Second Dist., Div. Five. Mar. 15, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY GENE DALE, Defendant and Appellant.

**COUNSEL**

Jo Ann S. Curtis, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari and Juliet H. Swoboda, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—A jury found defendant Terry Gene Dale guilty of second degree burglary. He was sentenced to prison; the judgment recited a prior burglary conviction and ordered that his sentence was to run consecutively to any time he was then serving.

## FACTS

The issues on appeal relate to an alleged denial of the right of defendant—who represented himself—to effective counsel, the denial of his motion to suppress evidence and alleged prosecutional misconduct. The facts of the crime are therefore briefly summarized.

The burglary occurred on July 22, 1975, in apartment 204 of 8429 Imperial in Downey. The tenant left the apartment at about 5 or 5:30 p.m., locking the door behind her. When she left the building, she observed a blue Pontiac GTO with a white top, later identified as similar to defendant's car.

When she returned, she noticed that the apartment door was open and that a number of things were missing.

At about 5:30 p.m., a neighbor observed two men at the door of apartment 204, apparently trying to get inside. She observed the GTO, which she described as a Lemans, parked in the street and then observed two men walking towards the car with a TV set and a pillowcase full of items. She called the police department, and described the men and the vehicle.

At about 5:45 p.m., an officer received a report of a burglary and a description of the vehicle and suspects. He observed what appeared to be the vehicle and the suspects. The officer followed the car, which sped away, and after a chase, eventually slowed down, at which point both the passenger and the driver—defendant—jumped out of the car and ran away. Defendant was immediately apprehended by the officer. The victim's color TV set was on the back seat of defendant's car. The victim's jewelry was found in the back seat of the police car which had been used to transport defendant and on defendant's person.

The defense was provided by Andrew Elias, also charged with the burglary who had earlier pleaded guilty. He claimed, in substance, that he, Elias, and another man—whom Elias declined to identify—asked defendant to drive them to a house to do some moving for the other man's girl friend; that defendant was not in the apartment when the burglary took place but was outside watching the other man's motorcycle, and that defendant did not know that a burglary had occurred until the police officer started to pursue him.

## DISCUSSION

*Effective Assistance of Counsel*: Defendant represented himself at trial. Appellate counsel now contends that defendant was thus denied his right to the effective assistance of counsel. The contention has no merit.

On September 18, 1975, defendant was arraigned and a public defender appointed to represent him. On October 15, defendant moved to be permitted to act as cocounsel; this motion was denied.

On October 24 defendant moved to represent himself. In response to questioning by the court, defendant stated that he had represented himself successfully twice in superior court and that he understood he had a right to have a lawyer appointed for him but he wanted to waive that right. He understood that if he decided to represent himself he would be "going to do it on [his] own without the court helping"; and that he would be held to the same standards as any other lawyer. The court told defendant that it had "never had a pro. per. that was found innocent" in his court. Defendant understood, but he did not want to discuss the matter further with the public defender. He wanted to go pro. per. even though the court pointed out that it was not "a good move," that it was going "to create a lot of problems" for defendant "at the time of trial," and that the court thought defendant was "making a very poor decision, . . ."

On that day, October 24, defendant agreed to a trial date of December 2 and waived time. The court ordered the public defender to give defendant all documents in his possession. In response to defendant's request for a legal runner, the court stated that it would award defendant "pro. per. status pursuant to the rules of court of the County Jail."[1]

On November 20, defendant was again advised by the court that he had a right to be represented by an attorney, and defendant again stated that he was waiving his right to an attorney. The court, in response to defendant's request for pro. per. jail privileges, again ordered that defendant be granted pro. per. status "pursuant to the rules and regulations of the County Jail." He advised defendant that that meant that the sheriff's department would provide him with the facilities necessary to prepare any papers including "the writing materials and

---

[1]The Los Angeles Superior Court policy memorandum then in effect required the pro. per. prisoner to pay for phone calls, runners, and equipment but did provide that the services of a licensed investigator could be authorized by the court.

everything to go with it," and that defendant would also be "entitled to use the telephone under the pro. per. status rules."

Defendant requested an investigator; the court asked him whether he had one in mind. Defendant said, James E. Giron. Although Giron was not on the approved list of investigators, the court appointed him. After a discussion concerning defendant's inability to pay for his telephone calls, the trial court ordered that the investigator provide defendant with a nominal amount of money for phone calls.

The public defender who had been appointed to represent defendant furnished him with the information and the preliminary hearing transcript. Defendant and the deputy district attorney discussed in open court a negotiated plea and defendant turned down an offer to strike three alleged prior felony convictions and a promise of concurrent prison time in exchange for defendant's plea to second degree burglary.

On December 2, defendant again appeared in court and claimed that he had not received any funds for stamps and envelopes. He then said: "I haven't talked to the investigator yet." The court asked why; defendant said: "I don't know. I don't know why." He then said he would like to change "it over to one of those you have on the approved list." Defendant was furnished with a list of the investigators and chose "the second to the last one on the list," who was Earl Snyder.

Defendant, claiming that he had not had "any supplies or anything," said that there were a few motions that he wanted to make but he had not been able to do so. He said he wanted to make a section 995 motion on sufficiency on the evidence. The district attorney waived any formal notice and the court set the hearing on the section 995 motion for December 5.

Defendant also asked to make an oral motion for a "change of venue," on grounds that he wanted a different judge. He said he wanted to make an "oral motion under 170.6 Code of Civil Procedure." The court offered to give him a form and pointed out that if defendant "exercised it" he could not exercise it again. After further discussion, it developed that defendant wanted to file an affidavit under section 170, subdivision 5. He did, and on December 8 the matter was transferred to another department.

On December 8, Department Southeast E transferred the matter to Department J. Defendant said: "Department J would be fine." On

December 9, Department J asked defendant whether he was familiar with the disqualification procedure under subdivision 5 and it developed that defendant was not quite clear about matters. The court explained the procedure. Defendant then said he did not want Southeast J to hear the case. On December 18, Southeast J informed defendant that the disqualification had been assigned to a judge in Ventura County.

On January 12, 1976, defendant's motion to disqualify the trial judge having been denied, defendant again appeared before that judge. The court asked defendant if he was ready for trial. Defendant said: "No, I'm not. I filed a mandamus prohibition in the appellate court appealing the 170 subdivision 5, which was denied." The court advised defendant that it would be ready to start his trial the next morning. Defendant said that the trial court had been very unfair with him and that he still had not received "any type of assistance as far as allocation of funds to be granted." He said that he had no paper and that the numerous papers he had filed had been filed on borrowed paper. He claimed that he had no investigator, who was essential to his defense. The court pointed out that two investigators had been appointed for him. Defendant said that he had not phoned the investigator because he did not have the investigator's phone number and he needed money to make a phone call. Defendant said that he had not had the opportunity to prepare a motion under section 1538.5. He reminded the court of the decision "that allows all persons to defend themselves if they want to," and informed the court that it "states in there [*Faretta*] that a person is entitled to a preparation of his defense with the same necessities as an attorney is allowed to use and the People have, such as typewriters, paper, carbon paper." The trial court proposed setting defendant's section 1538.5 motion for the day of trial, but defendant said he did not think that was fair, because that would not permit him to appeal a decision "or something and file a writ of prohibition. . ." The trial was set for March 9.

On February 20, the parties appeared for defendant's section 1538.5 motion but that matter had to be continued, because defendant had not notified the district attorney. The motion was then set for February 25, and on that day was heard and denied.

Finally, on March 9 the trial began. Defendant again said that he was not getting adequate paper, pencils and other materials and that he did not have any money. When the court informed defendant that a search had revealed $3.90, defendant said that the county jail "doesn't issue toothpaste, tooth brushes." The trial was held on March 9 and 10, 1976.

The jury began deliberations at 11:05 a.m. and at 2:05 p.m. returned with a verdict of guilty.

■ Appellate counsel contends that defendant did not effectively waive his right to counsel because he did not understand the nature of the offense charged, the pleas, defenses or punishment. Assuming that the factual assertions are correct, they are legally irrelevant.

*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], held that a defendant has a right under the Sixth Amendment to represent himself. The court ruled: "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, . . . ." The court pointed out that the defendant Faretta "was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, . . . ." (422 U.S. pp. 835-836 [45 L.Ed.2d pp. 581-582]) The court declined to assess how well or poorly the defendant had mastered criminal procedure, "for his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself."

In this case, as in *Faretta,* defendant was literate, competent and understanding; nothing in the record suggests that he was mentally retarded or emotionally disturbed. The trial court advised him several times that he was making a mistake. That is all *Faretta* requires. Moreover, we understand *Faretta* to mean that a trial court cannot, without infringing upon the Sixth Amendment right to self-representation, demand more of a defendant as a condition of his exercising his constitutionally protected right. (See *Thomas* v. *Superior Court* (1976) 54 Cal.App.3d 1054, 1059 [126 Cal.Rptr. 830].)

Defendant relies on pre-*Faretta* cases which have held that a defendant may waive counsel "only if the defendant has an intelligent conception of the consequences of his act [citation] and understands the nature of the offense, the available pleas and defenses, and possible punishments [citation]." (*People* v. *Floyd* (1970) 1 Cal.3d 694, 703 [83 Cal.Rptr. 608, 464 P.2d 64].) Neither *Floyd* nor any other pre-*Faretta* case applies. The requirement of a rigid inquiry before a defendant was permitted to represent himself was based on the assumption that the right involved *was* that to be represented by an attorney, rather than the

right to represent oneself. (See *People* v. *Sharp* (1972) 7 Cal.3d 448, 459 [103 Cal.Rptr. 233, 499 P.2d 489].) Since the courts indulge every reasonable presumption against the waiver of fundamental constitutional rights and do not presume acquiescence in the loss of such rights (*Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]), before *Faretta,* a stringent inquiry was required. *Faretta,* however, recognizes a constitutional right to represent oneself. Adherence to pre-*Faretta* standards would impermissibly condition the right to self-representation on a showing of legal knowledge which *Faretta* specifically eschews.[2]

Defendant, through appellate counsel, also contends that he did not effectively waive his right to counsel because his choice to represent himself was conditioned on his receiving materials from his public defender—which arrived late—and on his having adequate facilities in the jail. That contention is contrary to the record. Defendant's trial was held, as noted, on March 9. He appeared in court on October 24, November 20, December 2, December 8, December 9, December 10, December 15, December 18, 1975, January 12, February 20, February 25, 1976. At none of these appearances did defendant indicate that he wished to change his mind and be represented by an attorney.

Defendant next contends that even if the trial court initially properly granted defendant his right to proceed in pro. per., it soon became clear that he was not capable of representing himself and the trial court should have appointed counsel. We disagree. All that defendant's various appearances showed was that he lacked "technical legal knowledge," a matter not relevant under *Faretta* to an assessment of a defendant's knowing exercise of the right to defend himself. That this defendant did not know, for example, the difference between disqualification under sections 170, subdivision 5 and 170.6, that he did not know that a motion under section 1538.5 must be noticed 10 days in advance, that he did not know that orders denying motions under section 995 or 1538.5 are nonappealable are matters in which a lawyer is expected to have "skill and experience," but which under *Faretta* a criminal defendant "need

---

[2]In *People* v. *Lopez* (1977) 71 Cal.App.3d 568 [1] [138 Cal.Rptr. 36], the court, without wishing "to appear pedantic" or to "establish any horrendously complex or rigid standards" (*Id.,* at p. 571) listed guidelines to the trial courts to determine whether a defendant was validly elected to represent himself. Item 2d) suggests "[p]erhaps some exploration into . . . possible defenses and possible punishments . . . ." (*Id.,* at p. 573.) There is no problem in asking, but what if the defendant says: "My defenses are none of your business and I don't care what the punishment is, because I'll beat this rap." (See generally *Curry* v. *Superior Court* (1977) 75 Cal.App.3d 221, 226-229 [141 Cal.Rptr. 884].)

not himself have" to exercise his right of self-representation. (422 U.S. at p. 835 [45 L.Ed.2d at p. 581]).

■ Defendant contends that his right of self-representation interfered with the orderly and efficient administration of justice. Defendant cannot complain that his maneuvers had that effect. He is confusing his rights with the trial court's right, even under *Faretta*, to terminate self-representation by a defendant (422 U.S. at p. 834, fn. 46 [45 L.Ed.2d at p. 581]) and with the court's duty to the public to prevent a defendant from playing games in court. A further contention that the effect of permitting defendant to represent himself was to deny him a speedy trial is frivolous. (*People* v. *Floyd, supra,* 1 Cal.3d 694, 707.)

■ Finally defendant contends that he was entitled to the assistance of cocounsel.[3] There is no merit to that contention. While *Faretta* permits the use of standby counsel, nothing in *Faretta* suggests that the appointment of standby counsel is constitutionally compelled. (422 U.S. at pp. 834-835, fn. 46 [45 L.Ed.2d at p. 581].) A defendant in this state has never been entitled to either joint counsel or advisory counsel. (*People* v. *Hill* (1969) 70 Cal.2d 678, 691-692 [76 Cal.Rptr. 225, 452 P.2d 329].) *Faretta* does not affect that rule. (*People* v. *Wheeler* (1977) 68 Cal.App.3d 1056, 1059 [137 Cal.Rptr. 791].)

■ *Unlawful Search*: The police officer who apprehended defendant within minutes of the burglary received a radio report that two suspects were seen leaving the location. One suspect was Mexican, one "Caucasian"; they were driving a blue Pontiac Lemans with a white top, with collision damage to both the front and rear left side. The officer did not recall whether the age of the suspects was broadcast; however, the neighbor who phoned the police testified that both suspects were in the early twenties.

The officer observed a blue Pontiac GTO with collision damage to the rear of the vehicle. He turned his vehicle around; the Caucasian—defendant—who was driving the car "stepped on the gas and accelerated at a high rate of speed. . . ." The officer turned on his red light and siren. After a chase, during which defendant's vehicle went through a red light,

---

[3]Defendant's motion, made in early October to represent himself with cocounsel was, as noted above, denied. He claims that he later requested cocounsel. All the records show is that defendant, who claimed he did not have any money to make a telephone call to the investigator, told the court that he would like to get out on bail, "get some funds, hire an attorney to represent me so I won't have to go through all this hardship that I am put through now."

the vehicle slowed down and both the passenger and driver jumped out and ran. The officer followed on foot, and caught defendant. The officer then observed the victim's TV set on the back seat of defendant's car.

Defendant contends that because of minor discrepancies in the information received and the vehicle and suspects observed—defendant's vehicle was a Pontiac GTO, not a Lemans; he is 30 years old, not 20—the detention was unlawful. The contention has no merit; probable cause to arrest defendant was little short of overwhelming. (*People* v. *Bradford* (1972) 28 Cal.App.3d 695, 702 [104 Cal.Rptr. 852]; *People* v. *Chandler* (1968) 262 Cal.App.2d 350, 353 [68 Cal.Rptr. 645].) Defendant's further contention that the officer could not rely on the information because the neighbor who phoned it in was an "unreliable informant" is nonsense. (E.g., *People* v. *Hogan* (1969) 71 Cal.2d 888, 890 [80 Cal.Rptr. 28, 457 P.2d 868].)

■ *Prosecutional Misconduct*: The prosecutor, in cross-examining defense witness Elias, asked him questions about his involvement with narcotics. We agree that the prosecutor ought not to have asked Elias such questions. Leaving aside defendant's failure to object, the improper questions could hardly have prejudiced defendant. The jurors knew that Elias had previously pleaded guilty to the charged crime, and, having nothing at stake, was not the most credible witness.

■ Defendant also complains that the prosecutor committed misconduct in arguing to the jury. Defendant makes much out of nothing. A prosecutor may express his opinion of a defendant's guilt unless the statement appears to be based on information not presented at trial. (*People* v. *Kirkes* (1952) 39 Cal.2d 719, 723-724 [249 P.2d 1].) The prosecutor stated only the obvious when he pointed out that "this case is what we in the business call a lead pipe, it is a dead bang," and "I tried to prove Terry Dale guilty because I think that he is and the evidence shows it conclusively."

■ Defendant also complains that the prosecutor suggested that he would not prosecute a bad case. In the circumstances the prosecutor's remarks were excusable. The prosecutor stated that "every man has a right to represent himself and refuse a lawyer," but that "the People's lawyer has to appear," and that "juries often times are very concerned that a man is being taken advantage of." The prosecutor did get carried away when he also added that "no one takes advantage of anybody in a criminal courtroom, no prosecutor, because of the higher standards of

ethics that he is held to," and that his "license, my ethics and my career are in the judge's hands," and that there is "no way that one defendant is worth taking advantage of, ever." No conceivable prejudice was shown.

Affirmed.

Stephens, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 9, 1978.