[No. B139818. Second Dist., Div. Three. May 9, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFREDO SILFA, Defendant and Appellant.

**COUNSEL**

Katharine Eileen Greenebaum, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Mary E. Sanchez and Michael W. Whitaker, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

## FIDLER, J.*—

### Statement of the Case

Defendant was charged in a four-count information as follows: count 1, a violation of Penal Code[1] section 211, robbery; count 2, a violation of section 646.9, stalking; count 3, a violation of section 422, making a terrorist threat; and count 4, a violation of section 245, assault with a deadly weapon. It was further alleged that counts 1 and 4 were serious felonies within the meaning of section 1192.7 and that defendant had suffered a prior felony conviction within the meaning of section 667.5, subdivision (b).

Prior to trial, defendant had three *Marsden* hearings (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 456 P.2d 44]), all of which were denied. At the end of the second hearing defendant requested to represent himself, which request was denied.

After a jury trial, defendant was convicted only of count 2, section 646.9. Defendant was acquitted of all the remaining counts. Defendant admitted his prior conviction. Defendant was sentenced to the upper term of three years on count 2. He received an additional year for the section 667.5, subdivision (b) prior, consecutive to his three-year sentence. He also received a $200 fine pursuant to section 1202.4 and a stayed fine of $200 pursuant to section 1202.45.

### Statement Of Facts[2]

Viewed in accordance with the usual rule of appellate review (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618]) the facts established that defendant and Jennifer Medina had been dating for seven months, when Ms. Medina grew tired of arguing with defendant and ended the relationship. Defendant then called Ms. Medina at her home and asked her to reconsider. Ms. Medina eventually suggested to defendant that he "give it time" and they could still be friends.

On August 10, 1999, defendant called Ms. Medina at her home, indicating he wanted to continue the relationship. Ms. Medina cut the conversation off,

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All references herein shall be to the Penal Code unless otherwise noted.

[2]In light of our resolution of defendant's claim of error as to the *Faretta* issue (*Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562]), we shall set forth the facts in cursory fashion.

indicating to defendant she had to go to work. Defendant then began calling her at work, approximately issue 10 times, threatening to hurt her, because she had hurt him emotionally. Defendant stated that whatever he did, he would end up in jail for it.

A witness testified that after receiving the calls, Ms. Medina was crying, shaking and very upset. Ms. Medina did not want defendant coming to her workplace so she went to his house on her lunch break. She became frightened and asked a neighbor to help her. Defendant called Ms. Medina names, and hit her car and broke off her rearview mirror. Defendant had to be restrained by neighbors.

Ms. Medina drove away from defendant's residence. She then encountered defendant who was in his car. Defendant eventually positioned his car within a foot of Ms. Medina's car, blocking her and causing her to come to a stop. Defendant took her car keys and drove off. Ms. Medina was given a ride to the Chino Police Department by a passerby. Ms. Medina testified she told different versions of what happened to the police because she was frightened. The trial court admitted testimony concerning a prior, similar incident that defendant was involved in.

The defense presented evidence that defendant was not as upset at his house as Ms. Medina had testified he was. The prosecution presented rebuttal evidence that defendant was indeed so angry at his house he needed to be restrained by two people.

### ISSUES ON APPEAL

Defendant raises several issues on appeal. Because we find defendant's request to represent himself was improperly denied and that such error is reversible per se, we do not reach any of defendant's contentions except for the *Faretta* issue.

### I

#### *The Court Improperly Denied Defendant's Timely Request to Represent Himself*

On January 20, 2000, before beginning a *Marsden* motion, defendant indicated to the judge scheduled to hear the motion that he wished to represent himself. After being orally advised of the dangers of self-representation, defendant was sent back into the lockup to fill out the multipage questionnaire routinely given to defendants in Los Angeles County who wish to represent themselves. (See appen., *post.*)

When defendant returned to the courtroom he indicated he would be ready to proceed on the date set for trial. He also indicated to the court that he knew what crime he was charged with violating, he understood his right to counsel, his right to a jury trial, his right to use the subpoena power of the court, his right of cross-examination, his right against self-incrimination and his right to present a defense. He also told the court he understood he would not receive special privileges and indicated to the court he understood all the dangers of self-representation and the responsibility to act appropriately in court. The following colloquy then took place:

"The Court: Let's discuss the charges that were filed against you.

"Do you understand the element of the crimes you are charged with?

"The Defendant: The elements?

"The Court: The elements of the crimes.

"The Defendant: As far as what are you talking about?

"The Court: We know what the four charges are, and you're aware of what those are. There are certain elements of the crime that must be proved by the People. Do you understand and know what the elements are?

"The Defendant: Yes, the restraints and stalking. That's—that's—that's what they need to prove.

"The Court: They must prove the actual elements of a stalking charge.

"Do you understand what the elements are?

"The Defendant: I guess I don't know what you're asking. The elements?

"The Court: Do you know whether the charges are general intent crimes or specific intent crimes?

"The Defendant: I guess I don't know.

"The Court: Do you understand that, without knowing the answers to these questions, you're going to be held responsible for attempting to identify the—

"The Defendant: I'm just barely starting, Your Honor. I mean, I can do this. I already talked to three lawyers. I went to three lawyers, and they

didn't help me at all. They told me three different things, so I'd rather just do this by myself.

"The Court: Do you understand that, without knowing the elements of the crime and whether or not the crimes are general or specific intent crimes, you may not make proper objections as to admissibility of the relevant evidence?

"The Defendant: That's okay. I'm taking that chance.

"The Court: Do you understand that you may also not properly be able to assist yourself in the preparation of the jury instructions if you don't understand the crimes with which you are charged?

"The Defendant: That's okay. Like I said, I want to take my chances. . . .

"The Court: Do you know what his maximum is, [defense counsel]? Looks like it's around eight or—

"[Defense Counsel]: It's either eight years or four months or seven years and four years depending if it's a 654 issue.

"The Court: Do you understand what he said with regard to the 654?

"The Defendant: Yes, the 654—the vehicle assault.

"The Court: The 654 issue, do you know what that means?

"The Defendant: No, I don't. I wanted you to help explain that.

"The Court: No, sir.

"[Defense Counsel]: If I may just quickly intervene, we did discuss that. I didn't use '654' terminology, but we discussed the issue.

"The Court: But that's the kind of language he's going to hear at trial or any subsequent sentencing. All right.

"As to the actual trial, are you aware of the fact that you would not be allowed to ask any questions of the jurors before the selection because the

court does the voir dire, but the court sometimes asks if there's additional questions. Would you even have any idea of what questions to ask?

"The Defendant: To the jurors?

"The Court: Yes.

"The Defendant: I might ask them like—I might know what to ask the jurors.

"The Court: Do you understand that damaging evidence, such as hearsay evidence, may be admitted against you during the course of the trial unless you know what you're doing and you make proper objections?

"The Defendant: I didn't go to no law school or anything. So you're asking me—

"The Court: That's because you're about to begin a trial, sir, and I need to know that you really can represent yourself.

"The Defendant: I mean, I feel like I have to because I'm not being represented properly. I'm not getting a fair trial either way.

"The Court: Do you understand that you have prior felony convictions which have been alleged and that you would have to deal with such problems as to the admissibility of evidence of the charged crimes and the use of prior felony convictions possibly. If you were to take the stand to impeach and you don't make timely and proper objections, evidence highly detrimental to your case may come in before the jury.

"The Defendant: I have to read up on all that to understand all that. Yes, I mean—

"The Court: Do you understand that if you do not ask your questions to a witness properly, objections will be sustained.

"The Defendant. Okay. Yes, I understand that.

"The Court: Do you also understand that by your personally asking the questions because you will be acting as your own attorney, the jury may wonder as to your knowledge of the events about which you are questioning,

and they may read into the facts an admission on your part and then problems would occur if you allow—the court allows your attorney to continue representing you?

"Do you understand why I'm saying that?

"The Defendant: No, not really.

"The Court: Let me try it again.

"If you ask a witness a question on the stand—the jury now knows you're the defendant—but you're also asking this individual questions. The jury may infer from that that you have more knowledge about this crime which could then result in a guilty verdict simply because you've been asking certain questions. That won't happen if an attorney is representing you and an attorney is asking the questions.

"Do you understand that?

"The Defendant: I understand.

"The Court: Suppose you are convicted of the charge by a jury. Do you understand what the probable sentence is that you could receive as a result of your conviction as to each count?

"The Defendant: Yes. Eight years, whatever, you know. It just sounds ridiculous for me to get eight years for taking some of my ex-girlfriend's keys.

"The Court: But you've been offered three years today.

"The Defendant: Yes, I understand. But doesn't the court consider the fact that I discharged parole. I've been out for five years clean, going to school and working. Does that count for something?

"The Court: Maybe it does. I'm not sure what the People have looked at when they made that offer—let me finish my sentence.

"Because if you represent yourself, you're not going to be allowed to interrupt the court, the witnesses, or the attorneys. So you're going to have to sit patiently and wait your turn.

"The court is very concerned right now about whether or not you can actually go forward because you're saying to the court, well, I need time to research and learn all this, and that is not going to be given to you.

"The Defendant: Your Honor, then when I first made my first waive [*sic*], that was not an intelligent waiver that I made the first time, the first waive when I had to waive my time the first time. That wasn't an intelligent waiver.

"Do you understand what I'm trying to say?

"The Court: No. When you waived your time?

"The Defendant: When was the first time I waived? It's not on record or paper.

"The Court: What do you mean by 'waived'?

"[Defense Counsel]: I believe it was when [original counsel] was relieved, and [prior counsel] took over the case, and the case made it to a 0 of 30 case; is that correct?

"The Court: You're saying you didn't know what you were doing then?

"The Defendant: Basically, because the court didn't explain to me, closely explain, to me the nature of my—what would happen by me waiving my time.

"The Court: What has happened, that you didn't think you understood at the time?

"The Defendant: I mean, he just asked me do you care to waive my time, and I just—that was it. I didn't get a better explanation of waiving my time, what the consequences would be of me waiving my time.

"The Court: Do you understand the consequences now to be that you weren't advised of—

"The Defendant: Well, I'm just saying you don't understand what I'm trying to tell you—

"The Court: No.

"The Defendant: —About.

"The Court: All right.

"Back on November 5 [previous counsel] was relieved as your attorney, and the public defender's office was appointed. We set a new date as of [*sic*] 0 of 30 date. You're saying now that you've been harmed by us doing that?

"The Defendant: Yes.

"The Court: In what way?

"The Defendant: Because you asked me to waive time, and I did not understand me waiving my time. I didn't know the nature of it, like, what the consequences would be by me waiving my time.

"You know, I could have had a better—it could have benefitted me not to waive my time and just—I had a speedy trial from that point.

"The Court: Well, I'm glad to hear you say that to the extent then that—if you were—one of the things I'm concerned about is you're asking if the court did allow you to go pro per, you'd be asking for a continuance of your trial because right now you're set to go to trial in, what, two weeks?

"[Defense Counsel]: I think it's three weeks, Your Honor.

"The Court: Three weeks.

"The Defendant: All I'm asking is just to be represented fully the 100 percent from counsel, but I haven't gotten that prior from [him]. [Previous counsel], he deceived my family by saying he was a private attorney, and he turns out to be state appointed working for the Pomona Court. My family hired him, thinking he was just a private attorney and had nothing to do with the Pomona Court.

"I mean [he] works as a state appointed and works for free. My family had to pay him $3,500 cash. So he deceived my family, and I had asked him to tell [previous counsel] to give my family a statement for him to give to my mom, a statement of account, which he hadn't done that yet.

"The Court: Mr. Silfa, the court's very concerned about what you're saying right now. First of all, you're going back over material that's already been handled, but secondly, you're not understanding what the relationship is with [previous counsel], which also then shows this court your lack of knowledge regarding the legal system.

"The Defendant: Like I said, I didn't go to no law school. I'm sure a lot of pro pers haven't gone to law school.

"The Court: Mr. Silfa, let's suppose that you are convicted. What are the possible grounds for appealing a conviction, that is, the kind of sentence the defendant received, that is, if a lawyer does such a poor job of representing

a defendant and it amounts to a denial of his constitutional right to effective assistance of counsel, the case would be reversed on appeal.

"If you insist on representing yourself, you give up that right.

"Do you understand that?

"The Defendant: Yeah, I do.

"The Court: You don't get to say I had incompetent counsel.

"The Defendant: I understand that, Your Honor.

"The Court: I am concerned enough with regard to your answers as to the elements of the crime, the knowledge that you have as to the possible defenses available to you, the knowledge that you have as to the possible sentence you might receive, and it is obvious to me that you are incompetent to represent yourself as the record of these proceedings clearly demonstrates.

"*Although I'm satisfied that you're mentally competent and that you are fully informed of the right to counsel,* I find you do not understand what I've told you and what the consequences are of your contemplated act, and I specifically find that Mr. Silfa has not intelligently and voluntarily waived his right to be represented by counsel. (Italics added.)

"The motion to proceed in pro per is denied, and the public defender shall continue to represent the defendant." (Italics added.)

The form used by the Los Angeles Superior Court is not designed as a test that a defendant seeking self-representation must pass. ▮▮▮ As stated in *People v. Dale* (1978) 78 Cal.App.3d 722, 730 [144 Cal.Rptr. 338]:

"*Faretta* v. *California*[, *supra,*] 422 U.S. 806 . . . , held that a defendant has a right under the Sixth Amendment to represent himself. The court ruled: 'Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-represen-tation, . . . .' The court pointed out that the defendant Faretta 'was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, . . . .' (422 U.S. pp. 835-836 [45 L.Ed.2d pp. 581-582]) The court declined to assess how well or poorly the defendant had mastered criminal procedure, 'for his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.'

"In this case, as in *Faretta*, defendant was literate, competent and understanding; nothing in the record suggests that he was mentally retarded or emotionally disturbed. The trial court advised him several times that he was making a mistake. That is all *Faretta* requires. Moreover, we understand *Faretta* to mean that a trial court cannot, without infringing upon the Sixth Amendment right to self-representation, demand more of a defendant as a condition of his exercising his constitutionally protected right. (See *Thomas v. Superior Court* (1976) 54 Cal.App.3d 1054, 1059 [126 Cal.Rptr. 830].)"

The holding in *Dale* is equally applicable to the facts presented to us. While we appreciate the court's attempts to make sure defendant fully understood what risks his self-representation would entail and we are sympathetic to trial judges who want to ensure that defendants participate on a truly level playing field, the dictates of *Faretta* must be followed.

The Los Angeles Superior Court *Faretta* form must be seen as no more than a means by which the judge and the defendant seeking self-representation may have a meaningful dialogue concerning the dangers and responsibilities of self-representation. It is not, as we have indicated, *ante*, a test the defendant must pass in order to achieve self-representation. The advisements in the form also serve to warn the defendant of the complexities of the task about to be undertaken. They may not be used to disqualify individuals who do not understand each nuance of the complex subject matter presented.

In the instant matter the court found that defendant was mentally competent and fully informed of his right to counsel. He had demonstrated that he was literate and understood the dangers of self-representation. Nothing more was required of him in order to exercise his right of self-representation.

As was stated by the court in *People v. Brownlee* (1977) 74 Cal.App.3d 921, 934 [141 Cal.Rptr. 685]: "The test under *Faretta* is not whether the defendant is competent to act as his own lawyer but whether he 'knowingly' waives his constitutional right to counsel with a realization of probable risk and consequences."

Respondent cites the case of *Godinez v. Moran* (1993) 509 U.S. 389, 399-400 [113 S.Ct. 2680, 2686-2687, 125 L.Ed.2d 321] to support his contention that defendant did not understand the rights he was giving up. *Godinez* stands for the proposition that the competency required to waive the right to counsel does not equate to representing oneself in a competent manner.

Respondent argues that because defendant did not understand some matters on the waiver form, his waiver was not a "knowing and voluntary" one.

Respondent overlooks the very basis of *Faretta* itself, wherein the high court stated: "We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire*. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself." (*Faretta v. California, supra*, 422 U.S. at p. 836 [95 S.Ct. at p. 2541], fn. omitted.)

As our Supreme Court has pointed out in *People v. Welch* (1999) 20 Cal.4th 701, 733-734 [85 Cal.Rptr.2d 203, 976 P.2d 754], "As the United States Supreme Court further clarified in *Godinez*, however, the trial court may not ascertain a defendant's competence to waive counsel by evaluating the *ability to* represent himself or herself. [Citation.] In explaining the difference between the competence and waiver requirements, the high court stated: 'The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. [Citation.] The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced. [Citations.] *Godinez* 'explicitly forbids any attempt to measure a defendant's competency to waive the right to counsel by evaluating his ability to represent himself.' [Citation.]" (Fn. omitted.)

Here, defendant clearly established he knew and understood the significance and consequences of his decision and without coercion he wanted to waive his right to counsel. He fully understood and appreciated there were deficiencies in his understanding of the law pertaining to his case, but wanted to represent himself. It was error to deny him that right.

An erroneous denial of a timely *Faretta* motion is reversible error. (*People v. Carlisle* (2001) 86 Cal.App.4th 1382, 1390 [103 Cal.Rptr.2d 919] and cases cited therein.)

The Attorney General argues that defendant acquiesced in his representation by the public defender's office, a proposition for which he cites to us the case of *People v. Rudd* (1998) 63 Cal.App.4th 620, 631 [73 Cal.Rptr.2d 807]. *Rudd* involved a defendant who was allowed to represent himself with the understanding that if he were not ready for trial when the case was set, his counsel would continue to represent him. The defendant was not ready to proceed on the day of trial and the court voided his self-representation, without objection from the defendant.

In the instant matter defendant never acquiesced to representation by counsel, he was forced into it by the court. We also reject any suggestion by

the Attorney General that defendant's failure to understand every matter set forth in the *Faretta* waiver form indicates that his waiver of counsel was not knowing or intelligent.

DISPOSITION

Due to the *Faretta* error, the judgment is reversed and the matter is remanded back to the court below for a new trial. If the defendant again wishes to represent himself, the request shall be considered in light of this opinion.

Klein, P. J., and Croskey, J., concurred.

APPENDIX