Filed 05/29/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br>v.<br><br>WAKEEN BEST,<br><br>　　　Defendant and Appellant. | A155459<br><br>(City & County of San Francisco Super. Ct. No. SCN228739) |

Defendant Wakeen Best appeals a judgment entered upon a jury verdict finding her guilty of animal abuse, burglary, and vandalism.[1]  She contends the trial court erred in denying her *Faretta* motion to represent herself at trial (*Faretta v. California* (1975) 422 U.S. 806) and in failing to instruct the jury on unanimity.  We conclude the trial court erred in denying the *Faretta* motion, and therefore reverse the judgment.  While the record establishes that defendant was unlikely to be effective in conducting her own defense, *Faretta* nevertheless requires she be allowed to represent herself at trial.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.  The Incident**

A man parked his car on the seventh floor of the Sutter-Stockton Garage in San Francisco on February 10, 2018, leaving his Chihuahua dog in

---

[1] Defendant is a transgender woman.  The appellate briefs use feminine pronouns to refer to defendant, and we do the same.

the car. When he returned to the garage, he saw his dog had been brutally killed. It was a repulsive and sensational crime, the details of which have no bearing on this appeal. A security guard at the garage viewed video clips from the incident and recognized defendant.

Defendant was charged with three felonies: second degree burglary of a vehicle (Pen. Code, § 459; count 1);[2] killing, maiming, or abusing an animal (§ 597, subd. (a); count 2); and vandalism of the vehicle (§ 594, subd. (b)(1); count 3). She was also charged with four misdemeanors.

## II. The *Faretta* Motion

Defendant was represented pre-trial by an attorney from the public defender's office. At a March 14, 2018 hearing, the trial court declared a doubt about defendant's competency to stand trial; it appears that defendant refused to face the judge in order to avoid having her image recorded by members of the news media. The court suspended proceedings and appointed experts to evaluate defendant, but then on April 18, 2018 found defendant mentally competent to stand trial and reinstated criminal proceedings. On June 1, 2018, the matter was continued for trial and a *Faretta* hearing.

The *Faretta* hearing took place on June 4, 2018 before a different judge. The court confirmed that defendant had read and initialed each portion of an "Advisement and Waiver of Right to Counsel" form and inquired into defendant's education and awareness of the charges she faced. The court then asked defendant whether she understood that it would not be able to answer clarifying questions for her, that she would be held to the same standard as an attorney, that she had to follow the rules of evidence, that her case would be prosecuted by an experienced district attorney, that she would have to conduct the trial on her own, that she would have to make any post-

---

[2] All undesignated statutory references are to the Penal Code.

trial motions on her own, that she would face disadvantages such as limited access to a telephone and legal research, that she would not be granted a continuance of the trial unless she showed good cause, and that the court could terminate her right to self-representation if she engaged in misconduct or obstructed the progress of the trial. Defendant indicated she understood each of these things.

In the course of this colloquy, the court told defendant she could testify at her trial but could not be forced to do so, and asked if she understood; defendant initially responded "Okay," and the court reiterated, "Do you understand that?" Defendant replied, "That I cannot testify?" The court said, "My question is, that you have the right to testify at your trial. But you cannot be forced to testify." Defendant said "Yes," and when the court again asked if she understood, answered, "Yes, I do."

Some of defendant's responses betrayed a lack of understanding of legal concepts and procedure. For instance, when the court asked defendant if she understood she had a right to a speedy trial and a jury trial, defendant expressed confusion about the difference between the two. She seemed to think a speedy trial was one that took place without a jury. When the court asked defendant if she understood that she would have to make appropriate post-trial motions if convicted, and asked whether she knew what post-trial motions were, defendant first described them as "after the trial, the–kind of like the closing argument, closing statement" and "the wants and the desires of the defense to the prosecution and the judge"; asked to clarify, she said she would need to do more research but thought post-trial motions were "a summary of what you probably want to be done or would like to see done or— a summary of the trial of just summing up the—what was—what was clarified at trial before the courts, before the judge, before the People."

3

Defendant was also uncertain about the meaning of specific intent and general intent crimes. After noting that defendant had indicated on her *Faretta* form that she understood which of her charges were general intent crimes and which were specific intent crimes, the court asked defendant if she could tell which crime involved which type of intent. Defendant replied "Some are general; some are specific. [¶] They're all—they're all—all of them are general and specific crimes." Defendant then acknowledged that she did not know the difference between general and specific intent crimes but said she would do so by the time of trial, which could commence within two days.

Other responses indicated that defendant had examined the Penal Code and Evidence Code, but that her understanding of the statutory provisions she identified was limited or confused. For instance, she said she had been reading "the Evidence Code of the Penal Code," and that "There is a lot of Penal Codes in the Evidence Code that pertain to different subjects that pertain to different cases. [¶] Depending on what you're looking for, you can look in the index and you could look up different—different Penal Codes that can support—support you in trial . . ." When asked for examples, defendant replied, "I know—I'm familiar with Penal Code 123, materializing. I'm—you know, I'm familiar with Penal Code 118, perjury. 115. I'm familiar with Penal Code 131." The court asked defendant, "What's 131?" and defendant answered, "131 is—is when there is evidence—evidence that is submitted that may be—how do I say it? [¶] Evidence that is—evidence that is—I wouldn't say it's—I wouldn't say specifically tampered with. I would say it's evidence that is—evidence that is fraudulent." These responses indicate

defendant had examined the code sections she cited, although she did not seem to understand their application.[3]

When the court asked defendant about what legal defenses she might assert, her discussion of the law verged on incoherence. She told the court, "if you use Penal Code 3, which making retroactive any parts of the [P]enal [C]ode, you could, pretty much, using Penal Code 4, to construct. You can, pretty much, construct in order to—in order to receive the proper outcome in trial. [¶] By reading the different [P]enal [C]ode and looking underneath each and—each subsection of the [P]enal [C]ode, you can find different things that can help you in trial. Like, you could ask for certain things of the jury that if you didn't know to ask for a 1025, or a 1022, or a 1021, you wouldn't know." The court said, "A 1022 or a 1021 of the Penal Code?" and defendant replied, "Yes, I'm just saying—I'm just using this as example. You wouldn't know—if you didn't know to make it retroactive, you could possibly be overlooked, the things that you want done in your case. . . ."[4]

On the other hand, defendant gave clear and accurate answers to simpler questions. For example, the following colloquy occurred: "[The Court]: Do you understand that you have a right to subpoena witnesses? [¶] [Defendant]: Yes. [¶] [The Court]: Do you understand what that means?

---

[3] Sections 115 and 118 define the offenses of offering false documents for filing and perjury. Section 123 provides that a person accused of perjury need not know the materiality of the false statement. Section 131 prohibits willful misrepresentations in connection with investigations of corporate securities, commodities, or business activities.

[4] Section 3 provides that no part of the Penal Code is retroactive unless expressly so declared. Section 4 establishes the rule for construction of the Penal Code's provisions. Sections 1021 and 1022 consider the effects of a prior acquittal, and section 1025 considers the effect of a charged prior conviction.

[¶] [Defendant]: Yes. [¶] [The Court]: Tell me. [¶] [Defendant]: To call witnesses to the stand, . . . to have witnesses come be present in the courtroom [¶] . . . . [¶] on my behalf. [¶] [The Court]: And do you understand that you have the right to confront and cross-examine witnesses? [¶] [Defendant]: Yes, I do. [¶] [The Court]: And do you know what that means? [¶] [Defendant]: That means to ask questions. [¶] [The Court]: And see witnesses testify in open court. [¶] [Defendant]: Yes."

Defendant told the court she had acted in propria persona at a bench trial in San Mateo County between 2007 and 2012 and that she had won the case. The court told defendant it did not find a reference in defendant's "RAP sheet" to a trial or acquittal between 2007 and 2012. Defendant said, "Excuse me, your Honor. I would appreciate not being mistreated here. There is—it is in there. And I know my rights under the universal declaration of human rights in order to be represented." Defendant said she wanted to "be my own voice and no one else be my voice for me."

Before announcing its ruling, the trial court noted that a doubt had recently been declared as to defendant's competence and that another judge had determined defendant was competent to proceed to trial. The court went on: "And I'm not making a determination today whether or not you are competent to proceed to trial. The determination I am making is whether it is clear to me that you fully understand and appreciate the expectations that will be placed on you—" Defendant interjected, "I fully understand" before the court finished its sentence, "—if you represent yourself." The court told defendant that one of the expectations was that she not interrupt the court, and defendant apologized. The court went on, "That you fully appreciate and understand the consequences that might occur were you to represent yourself. And I will tell you from our very limited conversation, and my

6

review of your RAP, as well as your understanding of the [E]vidence [C]ode being contained inside the [P]enal [C]ode—" Defendant interjected, "It is not inside the [P]enal [C]ode. They're two separate books, your Honor. Two separate books." The court continued, "And that the post-trial motions is similar to closing statements or a summary of the trial. [¶] I only asked a couple specific things as related to a trial. Or that even not knowing the difference between a speedy trial and a jury trial. [¶] At this point, I am going to deny your request. [¶] And [defense counsel] will remain your counsel.

## III.   Verdict and Sentence

Defendant pled no contest to the four misdemeanors, and, after a jury trial, she was convicted of the three felonies with which she was charged. The trial court sentenced defendant to the upper term of three years for animal abuse (count 2); with a consecutive eight months of mandatory supervision for burglary (count 1); a consecutive eight-month sentence for vandalism (count 3), stayed pursuant to section 654; and six-month terms for the four misdemeanor counts, to be served concurrently with the felony sentence.

## DISCUSSION

Defendant contends the trial court's denial of her *Faretta* motion was reversible error. "*Faretta* holds that the Sixth Amendment grants an accused personally the right to present a defense and thus to represent [herself] upon a timely and unequivocal request. [Citation.] The right to self-representation . . . may be asserted by any defendant competent to stand trial—one's technical legal knowledge, as such, being irrelevant to the question whether [she] knowingly and voluntarily exercises the right." (*People v. Dunkle* (2005) 36 Cal.4th 861, 908, overruled on another point in

*People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *People v. Poplawski* (1994) 25 Cal.App.4th 881, 891 [defendant's lack of familiarity with legal language irrelevant to right to self-representation].)

Erroneous denial of a *Faretta* motion is reversible per se. (*People v. Carlisle* (2001) 86 Cal.App.4th 1382, 1390 (*Carlisle*).) We review de novo, and after a review of the entire record, the question of whether the defendant's invocation of the right to self-representation and waiver of the right to counsel was knowing and voluntary. (*People v. Marshall* (1997) 15 Cal.4th 1, 23–24; *People v. Mickel* (2016) 2 Cal.5th 181, 211–212.) However, in certain circumstances, the denial of a *Faretta* motion is within the discretion of the trial court and reviewed for abuse of discretion, as when a defendant is so disruptive or disrespectful as to preclude the exercise of self-representation (*People v. Welch* (1999) 20 Cal.4th 701, 735 (*Welch*)), or when a request for self-representation is untimely (*People v. Lynch* (2010) 50 Cal.4th 693, 722, 728 (*Lynch*)).

## I. Knowing and Voluntary Waiver

When a defendant makes an unequivocal request for self-representation, the trial court must determine whether the defendant is competent to waive the right to counsel, that is, whether the defendant is able to understand the nature and object of the proceedings and the risks and dangers of self-representation. (*People v. Phillips* (2006) 135 Cal.App.4th 422, 428; *Mickel, supra*, 2 Cal.5th at p. 206.) In order to do so, the court must discuss with the defendant the consequences of self-representation, i.e., that it is almost always unwise; the defendant will have to follow the same rules that govern attorneys; the prosecution will be represented by experienced, professional counsel; the court may terminate the right to self-representation if the defendant engages in disruptive conduct; the defendant will lose the

8

right to appeal on the grounds of ineffective assistance of counsel; and the defendant will not receive help or special treatment from the court and does not have the right to standby co-counsel. (*Ibid*.) But in determining whether a defendant is competent to choose self-representation, " '[t]he trial court is not concerned with the wisdom of defendant's decision to represent himself, or with how well he can do so. The sole relevant question is whether the defendant has the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation. . . .' " (*People v. Nauton* (1994) 29 Cal.App.4th 976, 979 (*Nauton*). " '[A] criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1364.)

More recent case law has established that criminal defendants may fall into a "gray-area" between competence to *stand trial* and competence to *represent themselves* at trial. (See *People v. Johnson* (2012) 53 Cal.4th 519, 527–528 (*Johnson*).) Even if a defendant is competent to stand trial, a trial court may deny self-representation if "the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id*. at p. 530; accord *Mickel*, *supra*, 2 Cal.5th at pp. 206–208, citing *Indiana v. Edwards* (2008) 554 U.S. 164, 178.) The "critical question is not whether a self-represented defendant meets the standards of an attorney, or even whether a defendant is capable of conducting an effective defense. Instead, [our high court has] accepted that the cost of recognizing a criminal defendant's right to self-representation may result ' "in detriment to the defendant, if not outright unfairness." ' [Citations.] But that is a cost we allow defendants the choice of paying if they can do so knowingly and voluntarily." (*Mickel*, at p. 206.)

9

The trial court here did not find, and the Attorney General does not contend, that defendant suffered from severe mental illness rendering her incapable of carrying out the basic tasks of presenting a defense—that is, that she was not mentally competent to represent herself. Although federal law limits the trial court's discretion to deny self-representation on this basis, we have upheld exercise of that discretion when a trial court makes findings that are supported by expert opinion and in-court observation of a defendant's conduct. (See, e.g., *People v. Gardner* (2014) 231 Cal.App.4th 945, 960.) "To minimize the risk of improperly denying self-representation to a competent defendant, 'trial courts should be cautious about making an incompetence finding without benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' " (*Johnson*, *supra*, 53 Cal.4th at pp. 530–531.) Here, although the trial judge was understandably troubled by defendant's responses to her questions, she made no such incompetence finding, nor would the confidential psychologist evaluations that were before the trial court have supported such a finding.

Rather than attack defendant's competence to represent herself, the Attorney General argues that the trial court properly found defendant did not make a knowing and intelligent waiver of her right to counsel. The Attorney General relies on the following: Defendant was inconsistent about whether she understood—and then displayed her ignorance of—certain concepts, such as a speedy trial; she initially misunderstood a compound question the court asked about her right not to testify at trial; she said she understood how certain statutes would support her case but then "rambled" about irrelevant Penal Code provisions and made statements to the effect that the Penal Code

10

was "in the Evidence Code"; she could not explain the nature of post-trial motions; and she was confused about general intent and specific intent crimes. The Attorney General argues that, taken together, these statements show defendant did not fully understand the dangers and disadvantages of self-representation, and that this was the reason the trial court denied defendant's motion.

But these facts reveal little more than that defendant lacked knowledge of criminal law and courtroom procedure, which is not a basis to deny the right to self-representation. This principle was explained in *Poplawski, supra,* 25 Cal.App.4th 881. The court there noted that a defendant choosing self-representation must do so " ' "competently and intelligently," ' " but technical legal knowledge is irrelevant to whether he or she is competent to waive the right to counsel. (*Poplawski*, at p. 894.) The court concluded there was insufficient evidence to support the revocation of the defendant's pro se status on the ground that he lacked the necessary English language communicative skills. (*Ibid.*) It went on to reject the trial court's reliance on the defendant's inability to understand the proceedings exactly, stating, "were we to construe *Faretta* and its progeny as requiring the denial of pro se status merely on the basis of an accused's ignorance of the relevant rules of procedure, substantive law, and courtroom protocol, few requests for self-representation would ever be granted." (*Id.* at pp. 894–895.)

*People v. Silfa* (2001) 88 Cal.App.4th 1311 (*Silfa*), which held the trial court erred in denying a *Faretta* motion, is on point. During the hearing on the motion, the trial court in *Silfa* asked the defendant if he understood the elements of the crimes he was charged with, and the defendant indicated he did not understand what the court was asking. (*Id.* at p. 1315.) The court asked if he understood whether the charges were general intent or specific

intent crimes, and the defendant said he did not. (*Ibid*.) The court pointed out that, without knowing these things, the defendant might not be able to make proper evidentiary objections or assist in the preparation of jury instructions, and the defendant said he would take that chance. (*Id*. at pp. 1315–1316.) In discussing the possible sentence, defendant said that he did not understand what "654 issue" meant and that he would like to court to help explain that. (*Id*. at p. 1316.) He said he "might know what to ask the jurors" during voir dire, implicitly conceding that he might not. (*Id*. at pp. 1316–1317.)

After further discussion, the trial court ruled, " 'I am concerned enough with regard to your answers as to the elements of the crime, the knowledge that you have as to the possible defenses available to you, the knowledge that you have as to the possible sentence you might receive, and it is obvious to me that you are incompetent to represent yourself as the record of these proceedings clearly demonstrates. [¶] '*Although I'm satisfied that you're mentally competent and that you are fully informed of the right to counsel*, I find that you do not understand what I've told you and what the consequences are of your contemplated act, and I specifically find that Mr. Silfa has not intelligently and voluntarily waived his right to be represented by counsel.' " (*Silfa, supra*, 88 Cal.App.4th at p. 1321.)

The appellate court concluded this ruling was error: "In the instant matter the court found that defendant was mentally competent and fully informed of his right to counsel. He had demonstrated that he was literate and understood the dangers of self-representation. Nothing more was required of him in order to exercise his right of self-representation." (*Silfa, supra*, 88 Cal.App.4th at p. 1322.) The court went on, " 'As the United States Supreme Court further clarified in *Godinez* [*v. Moran* (1993) 509 U.S. 389],

12

. . . the trial court may not ascertain a defendant's competence to waive counsel by evaluating the *ability to* represent himself or herself. [Citation.] In explaining the difference between the competence and waiver requirements, the high court stated: "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. [Citation.] The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." (*Silfa*, at p. 1323.) The court concluded, "Here, defendant clearly established he knew and understood the significance and consequences of his decision and without coercion he wanted to waive his right to counsel. He fully understood and appreciated there were deficiencies in his understanding of the law pertaining to his case, but wanted to represent himself. It was error to deny him that right." (*Ibid*.)

The same is true in this case. Defendant had been found competent to stand trial, and the trial court did not revisit that determination. There is no indication she suffered from severe mental illness to the point she was not competent to conduct trial proceedings on her own (see *Mickel*, *supra*, 2 Cal.5th at p. 208), and the trial court made no such finding. Her invocation of the right to self-representation was unambiguous, and the record indicates it was knowing and voluntary. She filled out the *Faretta* waiver form and, at the hearing on the *Faretta* motion, said she understood the rights she was giving up and the risks and disadvantages of representing herself. Although many of her answers to the court were rambling and betrayed a lack of understanding of the law, they do not indicate she was illiterate; indeed, her responses showed she had spent time reviewing the Penal Code and the

13

Evidence Code. We recognize that she did not understand such concepts as specific intent and general intent, but her ignorance of legal procedure and language is not a basis to deny her the right to self-representation.

As *Silfa* explained in discussing an analogous *Faretta* form, the form "is not . . . a test the defendant must pass in order to achieve self-representation." (*Silfa, supra*, 88 Cal.App.4th at p. 1322.) Its advisements "serve to warn the defendant of the complexities of the task about to be undertaken. They may not be used to disqualify individuals who do not understand each nuance of the complex subject matter presented." (*Ibid.*) The warning served its purpose here. In responding to the court's questions, the defendant was forced to acknowledge that her written answers overstated her knowledge of the law, specifically that she would have to do more research to understand post-trial motions or the difference between general and specific intent crimes. As in *Silfa*, the colloquy exposed that the defendant "appreciated there were deficiencies in [her] understanding of the law," but she nonetheless remained steadfast in wanting to represent herself. (*Id.* at p. 1323.)

*Silfa* has already rejected the argument the Attorney General makes in this case. In both cases, "Respondent argues that because defendant did not understand some matters on the waiver form, [her] waiver was not a 'knowing and voluntary' one," and in both cases this argument "overlooks the very basis of *Faretta* itself, wherein the high court stated: 'We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire*. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.' " (*Silfa, supra*, 88 Cal.App.4th at pp. 1322–1323, quoting *Faretta*,

14

supra, 422 U.S. at p. 836, fn. omitted.)  In this case, as in *Silfa* and *Faretta*, the defendant's decision to self-represent was almost certainly unwise.  But even if self-representation results in an unfair trial, "defendant's choice 'must be honored.' " (*People v. Taylor* (2009) 47 Cal.4th 850, 866 (*Taylor*).)  It was accordingly error for the trial court to deny defendant the right to represent herself on the grounds she had not knowingly and voluntarily made that choice.[5]

## II. Alternate Discretionary Grounds

Even if a trial court denies a *Faretta* motion for an improper reason, we uphold the ruling "if the record as a whole establishes defendant's request was nonetheless properly denied on other grounds." (*People v. Dent* (2003) 30 Cal.4th 213, 218.)  Relying on this principle, the Attorney General argues the *Faretta* motion was properly denied because it was untimely and defendant was disruptive and disobedient.

A trial court has discretion to deny a *Faretta* motion when a defendant is "so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-

---

[5] As the dissent points out, the defendant in this case was more of a blusterer than the defendant in *Silfa*, and represented as true something she could not substantiate with independent evidence (e.g., her RAP sheet).  This behavior will serve her poorly if it continues at trial, but it does not vitiate her knowing and voluntary choice to self-represent.  Nor are errors in following the directions on the *Faretta* form disqualifying, just as they were not in *People v. Blair* (2005) 36 Cal.4th 686, 703–704 [instructed to initial waiver form, defendant marks it with "x"'s instead], overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919–920, since the form is not a test a defendant must pass to self-represent.  (*Silfa, supra*, 88 Cal.App.4th at p. 1322.)  To hold otherwise is to risk reintroducing, through the enquiry into whether waiver was knowing and voluntary, a requirement for " 'cognitive and communicative skills' " that our Supreme Court has previously rejected in the context of assessing a defendant's competence to choose self-representation.  (See *Taylor, supra*, 47 Cal.4th at pp. 873–876.)

representation." (*Welch, supra*, 20 Cal.4th at p. 735.) But the trial court did not do that here. Although the court admonished defendant not to interrupt the court, it did not rely on any interruption or misbehavior in denying the *Faretta* motion. Instead, the court stated that it was determining only whether defendant fully understood the expectations she would face at trial, and it relied on her lack of legal knowledge—not any possible delay or disruption—in answering this question in the negative.

We might hesitate to find that the evidence here supported a denial of the *Faretta* motion on grounds of disruptiveness. True, defendant had hidden behind counsel and refused to face another judge on one occasion, leading the court to declare a doubt as to her competence to stand trial, but the presence of television cameras in the courtroom may have explained defendant's conduct on that occasion. Also true, the defendant interrupted the court during the *Faretta* hearing, and some of her responses to questions were difficult to follow. But her conduct at the hearing drew a single reprimand and was not, as best we can tell from the transcript, "so disruptive . . . as to preclude" self-representation. (*Welch, supra,* 20 Cal.4th at p. 735.)

The question before us is not, however, whether denying the motion on grounds of disruptiveness would have been an abuse of discretion. The trial court seems not to have found defendant's conduct so disruptive as to deny self-representation on that basis, so the question before us is whether this omission was an abuse of discretion. *Dent* explains that we uphold a ruling made on an improper ground if the record shows the "request *was* nonetheless properly denied on other grounds," but it does not address requests that merely could have been denied on discretionary grounds. *(Dent, supra*, 30 Cal.4th at p. 218, italics added.) This case is therefore different from *Welch*, where the trial court improperly relied on defendant's

16

limited ability to represent himself, but *also* properly relied on defendant's disruptiveness to deny the *Faretta* motion. (*Welch, supra,* 20 Cal.4th at pp. 734–736.) *Dent* neither requires nor allows us to imply discretionary findings that the trial court did not in fact make.[6]

As California courts have long recognized, " ' "If a ruling which might have been made as a matter of discretion is based entirely upon other grounds, the appellate court will not consider whether the ruling would constitute a proper exercise of the discretionary power." ' " (*Bergin v. Portman* (1983) 141 Cal.App.3d 23, 27–28, quoting *People v. Union Machine Co.* (1955) 133 Cal.App.2d 167, 171.) Other state courts have applied this principle in reviewing *Faretta* motions. (See *Oviuk v. State* (Alas. App. 2008) 180 P.3d 388, 391 [where trial court denied self-representation on erroneous basis, it is improper for appellate court to affirm on alternate ground of untimeliness not found by trial court]; *State v. Braswell* (Conn. 2015) 318 Conn. 815, 834–835 [although "a defendant may forfeit his right to self-representation by exhibiting disruptive behavior . . . the defendant's behavior was not the reason for the court's denial in the present case," so *Faretta* ruling could not be affirmed on that basis].) Because the trial court did not deny defendant's *Faretta* motion on grounds of disruptiveness, we cannot here uphold the trial court's ruling on this alternate ground.

---

[6] This case is also different from *People v. Boyce* (2014) 59 Cal.4th 672, on which the dissent relies. In *Boyce,* the Supreme Court affirmed denial of a *Faretta* motion because the defendant never unequivocally requested to represent himself, which was not a reason the trial court had given. (*Id.* at pp. 703, 705.) But because appellate courts review de novo whether a request to self-represent is unequivocal (*Dent, supra,* 30 Cal.4th at p. 218), we can affirm on this ground even when the trial court has not addressed it. Here, by contrast, the alternate grounds urged upon us are not issues of law, but matters committed to the sound discretion of the trial court.

We similarly reject the Attorney General's contention that we should uphold the ruling because defendant's request was untimely.  A self-representation motion may be denied as untimely if it is not made " 'a reasonable time prior to the commencement of trial.' " (*Lynch*, *supra*, 50 Cal.4th at p. 722.)  An untimely motion is addressed to the sound discretion of the trial court.  (*Ibid*.)  This rule is intended to prevent a defendant from misusing a *Faretta* motion to delay trial or obstruct the orderly administration of justice.  (*People v. Burton* (1989) 48 Cal.3d 843, 852; see also *Lynch*, at pp. 727–728 [no abuse of discretion in denying motion as untimely where defendant waited nearly four years to seek self-representation and would need substantial delay of trial to prepare defense]; *People v. Ruiz* (1983) 142 Cal.App.3d 780, 790–791 [although defendant did not bring motion a few days before trial for *purpose* of delay, continuance would be necessary for defendant to prepare defense].)  In exercising its discretion, the court considers whether defense counsel needs further time for preparation, "the 'quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " (*Burton*, at p. 853, quoting *People v. Windham* (1977) 19 Cal.3d 121, 128.)  There is no hard and fast rule for how long before trial is "reasonable." (*People v. Clark* (1992) 3 Cal.4th 41, 99.)  Timeliness of a *Faretta* motion "is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made." (*Lynch*, *supra*, 50 Cal.4th at p. 724.)

Defendant made her motion on June 1, 2018, and the hearing took place three days later.  The trial court did not find the motion untimely or

18

find it would cause delay, and there is no basis to conclude it was brought for purposes of, or would have caused, delay. Defense counsel indicated that the next trial readiness date had been set for June 6, 2018, two days after the *Faretta* hearing. When the court told defendant the trial could begin as soon as June 6, she replied, "Okay." She did not request a continuance. When the court asked if she knew the difference between general and specific intent crimes, she said she would know that by trial; the court confirmed, "By Wednesday," and she replied, "Yes." Because the record contains nothing indicating self-representation would have delayed the trial, we cannot uphold the ruling on the alternate grounds that it was untimely. (See *People v. Tyner* (1977) 76 Cal.App.3d 352, 355 [where defendant's "motion for self-representation was made prior to trial and was not accompanied by any request for a continuance, its grant would not have obstructed the orderly administration of justice"]; *Moon v. Superior Court* (2005) 134 Cal.App.4th 1521, 1530 [defendant "did not want a continuance or even so much as a recess," so "[t]here was nothing upon which to base a prediction of disruption"].)

## III. Conclusion

An erroneous denial of a timely *Faretta* motion is reversible per se. (*Carlisle, supra,* 86 Cal.App.4th at p. 1390; *Dent, supra,* 30 Cal.4th 218.) Applying this rule, we must reverse the judgment and remand the matter for a new trial. (*Silfa, supra,* 88 Cal.App.4th at p. 1324.) Because we do so, we need not consider defendant's remaining contentions on appeal.

We emphasize that our decision is based on the record as of the time the trial court denied defendant's *Faretta* motion. Nothing we say here prevents the trial court on remand from evaluating defendant's competence

19

to represent herself, and the potential for disruption, based on conditions as they exist at the time of any new motion for self-representation.

Finally, although the parties do not raise this issue, we note that the transcript of the *Faretta* hearing does not show defendant was advised of the maximum punishment she faced for the offenses with which she was charged. (*People v. Jackio* (2015) 236 Cal.App.4th 445, 454–455.)  While failure to advise on all aspects of potential punishment does not necessarily render a *Faretta* waiver invalid, it is the better practice to provide this information (*People v. Bush* (2017) 7 Cal.App.5th 457, 473–474) so as to ensure the defendant understands the risk she faces.  We trust that if defendant again seeks to represent herself, she will be fully informed of the consequences of her decision, in particular the state prison time she faces.

## DISPOSITION

The judgment is reversed.  The matter is remanded for a new trial.  If defendant again seeks to represent herself, the request shall be considered in light of this opinion.

_____
TUCHER, J.

I CONCUR:


_____
STREETER, Acting P. J.

_People v. Best_ (A155459)

21

BROWN, J., Dissenting

## Introduction

Because I disagree with the majority's analysis of the record and governing authorities, I respectfully dissent.

The majority casts this case as one in which the trial court improperly denied Ms. Best the right to represent herself based on the court's purported assessment of her "ignorance of legal procedure and language." (Maj. opn. at p. 14.) The majority deems this an inappropriate inquiry because "technical legal knowledge is irrelevant to whether [a defendant] is competent to waive the right to counsel." (Maj. opn. at p. 11.) In my view, review of the record demonstrates that the trial judge was not focused on testing Ms. Best's technical legal knowledge, but was instead appropriately concerned with whether Ms. Best was *knowingly* and *intelligently* waiving her right to counsel, such that she truly understood the "dangers and disadvantages of self-representation." (*Faretta v. California* (1975) 422 U.S. 806, 835.) Moreover, even if the majority were correct in holding that the trial court improperly relied on Ms. Best's miscomprehension of legal concepts and procedures, the record establishes an independent basis for affirming the trial court's denial of the *Faretta* motion: i.e., Ms. Best's disruption of courtroom proceedings by her repeated interruptions and her insistence on arguing "facts" that did not occur.

## Discussion

### I. Additional Facts

Because the majority opinion captures much of the colloquy between the judge and Ms. Best at the hearing on the *Faretta* motion, there is no need to repeat it here. I offer only a handful of additional facts that are, in my opinion, pertinent to our review.

First, comparison of the hearing transcript and the *Faretta* waiver form demonstrates that the trial court's questions were not an attempt to quiz Ms. Best on her legal knowledge, but were instead an effort to probe whether Ms. Best truly understood the consequences of her self-representation request. For example, the court's initial inquiries regarding Ms. Best's understanding of her right to have an attorney free of charge, her right to a speedy trial and jury trial, and her right to subpoena witnesses track the first three rights set forth on Ms. Best's *Faretta* waiver form. Indeed, the court expressly stated that its purpose in "go[ing] over all of this paperwork"—i.e., the waiver form—was to ensure that Ms. Best "underst[ood] what will be happening," and that she "underst[ood] what [she was] asking of this Court."[1]

On its face, the *Faretta* waiver form provides sound reason for the court's concern with whether Ms. Best truly understood the rights she was giving up and the consequences of doing so. For example, notwithstanding Ms. Best's placing her initials or checking "yes" in every box on the form—purportedly indicating her comprehension of each of the stated rights and the potential dangers and disadvantages of self-representation—the form reveals a rather fundamental lack of understanding: Her handwritten list of charges fails to include three of the seven counts she was facing, including the felony vandalism charge and two misdemeanors. Moreover, Ms. Best signed the *Faretta* waiver form's "Interpreter's Statement," representing that she was a "court interpreter" who translated the form in "English" to herself, thus

---

[1] The court's colloquy thus contrasts with *Faretta*, where the trial court revoked its prior grant of the defendant's self-representation request after challenging him to answer the following questions: " 'How many exceptions are there to the hearsay rule?' " " 'What are the grounds for challenging a juror for cause?' " and " 'What is the code section' " governing voir dire. (*Faretta, supra*, 422 U.S. at pp. 808, fn.3, 809–810.)

2

demonstrating either that she did not carefully read or that she did not understand the form.

In addition, Ms. Best wrote on the *Faretta* waiver form that she had previously represented herself in "San Mateo County (2007–2012)," expressly stating, "I won my case." Ms. Best then orally reiterated this claim in her discussions with the court. The trial court questioned this assertion, noting that no such case appeared in defendant's RAP sheet, but defendant insisted that the court was wrong: "It's in [the RAP sheet] [¶] . . . . [¶] Excuse me, your Honor. I would appreciate not being mistreated here. There is—it is in there. And I know my rights under the universal declaration of human rights in order to be represented." We have obtained Ms. Best's RAP sheet from the trial court, and although it contains dozens of arrests from six California counties and two other states, the trial court was correct in finding that Ms. Best had never been arrested, charged, or acquitted in San Mateo County. At best, defendant was misperceiving her own criminal past in a significant way; at worst, she was willfully misrepresenting it in an attempt to convince the court to grant her motion.

Finally, the transcript of the hearing on defendant's *Faretta* motion reveals the justifiable basis for the court's frustration with the defendant's interruptions. The defendant interrupted the judge at least six times during the 30-minute hearing, including almost immediately after the court admonished her for her repeated interruptions:

[COURT]: The determination I am making is whether it is clear to me that you fully understand and appreciate the expectations that will be placed on you— [DEFENDANT, *interrupting*]: I fully understand.

[COURT]: —if you represent yourself.

[DEFENDANT]: Yes, I do.

3

[COURT]: And one of those expectations is that you not interrupt the Court.

[DEFENDANT]: Oh, excuse me. Sorry.

[COURT]: That you fully appreciate and understand the consequences that might occur were you to represent yourself. And I will tell you from our very limited conversation, and my review of your RAP [sheet], as well as your understanding of the [E]vidence [C]ode being contained inside the [P]enal [C]ode—

[DEFENDANT, *interrupting*]: It is not inside the [P]enal [C]ode. They're two separate books, your Honor. Two separate books.

[COURT]: And that post-trial motions is similar to closing statements or a summary of the trial."

## II.   Analysis

Many of Ms. Best's statements to the court demonstrate that she did not knowingly and intelligently waive her right to counsel with a full appreciation of the dangers and disadvantages of self-representation—notwithstanding her initials on the waiver form indicating her purported understanding of the specified rights and consequences. (*Faretta, supra,* 422 U.S. at 835.) In other words, the record did not "establish that '[s]he knows what [s]he is doing and [her] choice is made with eyes open.' " (*Ibid.*, quoting *Adams v. United States ex rel. McCann* (1942) 317 U.S. 269, 279.) As but one example, in the section of the waiver form marked "DANGERS AND DISADVANTAGES TO SELF-REPRESENTATION," Ms. Best initialed the box indicating that she understood that she would have to "mak[e] appropriate motions after trial" without the assistance of attorney, but then gave the following nonsensical explanation of her purported understanding: "Post-trial motions is after the trial, the—kind of like the closing argument,

4

closing statement. [¶] . . . . [¶] That's pretty much, what I've gathered. [¶] . . . . [¶] Or the—the wants—the wants and the desires of the defense to the prosecution and the judge post-trial motions. That's all tied in together, I believe." When a defendant clearly does not comprehend the basic expectations of representing herself (despite her written initials to the contrary), how can the record support a finding that she has *knowingly and intelligently* waived the right to counsel, with her " 'eyes open' " to the dangers and consequences of self-representation? (*Adams*, at p. 279; see also *People v. Burgener* (2009) 46 Cal.4th 231, 241 [" 'the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case' "].) In my view, it cannot, and the trial court was not punishing Ms. Best for her lack of technical legal knowledge, but was instead appropriately unconvinced that Ms. Best's waiver was in fact knowing and intelligent. (See *United States v. Kimmel* (9th Cir. 1982) 672 F.2d 720, 721 [finding the record failed to show defendant's knowing and intelligent waiver of right to counsel; "A waiver of counsel cannot be knowing and intelligent unless the accused appreciates the possible consequences of mishandling these core functions and the lawyer's superior ability to perform them"].)[2] Indeed, as the court explained—over and despite Ms. Best's interruptions—it was focused on determining "whether it is clear to me that you fully understand and appreciate the expectations that will be placed on you—[¶]

---

[2] Ms. Best, perhaps unsurprisingly, had a different view of her abilities: After insisting that she "underst[ood] very well"—notwithstanding that her in-court statements "verged on incoherence" (maj. opn. at p. 5) and demonstrated numerous misunderstandings as to the items she had checked on the *Faretta* waiver form—Ms. Best informed the trial judge, "If [court-appointed counsel were] to represent me, ma'am, it would be no—it would be no different than I representing myself."

5

. . . . [¶]—if you represent yourself.  [¶] . . . . [¶]  That you fully *appreciate and understand the consequences that might occur were you to represent yourself.*" (Italics added.)

The cases on which the majority primarily relies are not on point.  In *People v. Poplawski* (1994) 25 Cal.App.4th 881 (*Poplawski*), after a judge allowed the defendant to proceed pro se, a second judge revoked the defendant's pro se status because he was not fluent in English and was "ignoran[t] of the meaning of the word 'motion,' " leading the court to conclude he did not understand the proceedings and was incompetent to represent himself.  (*Id.* at pp. 887, 891.)  The appellate court held that the revocation violated the Sixth Amendment, stating it was unaware of any authority that allowed a court to revoke pro se status on the grounds stated. (*Id.* at pp. 886, 889.)  Discussing the requirements for a valid waiver of the right to counsel, the *Poplawski* court also observed that the right of self-representation cannot be denied to a defendant who understands the significance of her decision to proceed pro se merely because she lacks legal expertise and does not know the rules of procedure or courtroom protocol. (*Id.* at pp. 894–895.)

*Poplawski* is distinguishable because it involved a revocation of pro se status, which was deemed permissible only for disruptive in-court conduct or substantial evidence of incompetency (*Poplawski, supra,* 25 Cal.App.4th at p. 889); the issue before the court was not whether there was a knowing and voluntary waiver.  Here, the record demonstrates that the judge denied pro se status because Ms. Best did not actually understand the significance of her decision to waive counsel, not because she was unable to recite technical aspects of the rules of procedure or substantive law.  "The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant

6

actually *does* understand the significance and consequences of a particular decision . . ." (*Godinez v. Moran* (1993) 509 U.S. 389, 401, fn. 12.) The judge asked Ms. Best about the Penal and Evidence Codes when assessing whether she understood that she would be required to follow specialized rules, and the judge admonished her that, without counsel, she was at a disadvantage precisely because she did not understand the intricacies of the proceeding. Indeed, the court's inquiries were similar to those of the judge in *Poplawski* who initially granted the defendant's request to proceed pro se. (*Poplawski*, *supra*, 25 Cal.App.4th at pp. 885–886 [asking about the defendant's knowledge of the Evidence Code, how a trial worked, and the responsibilities he would undertake].) Again, the court was clear with Ms. Best: "The determination I am making is whether it is clear to me that you fully understand and appreciate the expectations that will be placed on you—" "[t]hat you fully appreciate and understand the consequences that might occur were you to represent yourself." (*People v. Phillips* (2006) 135 Cal.App.4th 422, 429 ["the trial court is obligated to make an inquiry into defendant's understanding of the nature and seriousness of the charges against him and . . . of the law in order for the court to decide whether defendant understands the risks and disadvantages of representing himself"].)

 *People v. Silfa* (2001) 88 Cal.App.4th 1311 (*Silfa*) is similarly distinguishable. In that case, the defendant's answers were all sensible and responsive, he knew the charges he was facing, he candidly admitted the legal terms he did not know (such as "elements" and "654 issue[s]"), he made no errors on the *Faretta* waiver form, his oral statements did not demonstrate that he had initialed the form despite a lack of understanding as to what it stated, and he made no misstatements as to his experience with self-

7

representation.  (*Silfa,* at pp. 1315–1321, Appendix A.)  By contrast, Ms. Best repeatedly gave nonsensical and rambling responses, failed to include on the waiver form three of the seven charges she was facing, falsely claimed to understand things she clearly did not, signed the interpreter's statement saying that she had translated the form in English to herself, and misrepresented (or at best misperceived) her own criminal history and experience with self-representation.

In reversing the trial court, *Silfa* relied on the fact that the defendant "clearly established he knew and understood the significance and consequences of his decision" and "fully understood and appreciated there were deficiencies in his understanding of the law pertaining to his case." (*Silfa, supra*, 88 Cal.App.4th at p. 1323.)  In my view, Ms. Best presents the opposite scenario:  The record clearly establishes that she did *not* know and understand the rights she was giving up and the significance and consequences of self-representation.  For example, rather than "fully underst[anding] and appreciat[ing] there were deficiencies in [her] understanding of the law pertaining to [her] case," she baselessly insisted that she "did know the answer" to questions such as the difference between her rights to a speedy trial and a jury trial when her own statements made clear she did not.  Likewise, notwithstanding her confidence in her asserted grasp of "a lot of Penal Codes in the Evidence Code that pertain to different subjects that pertain to different cases," she in fact displayed a fundamental miscomprehension of the Penal Code sections she professed to understand might "support [her] in trial," as exemplified by her incomprehensible (yet self-assured) pronouncement that "if you use Penal Code 3, which making retroactive any parts of the [P]enal [C]ode, you could, pretty much, using Penal Code 4, to construct.  You can, pretty much, construct in order to—in

8

order to receive the proper outcome in trial." (Maj. opn. at p. 5) Thus, unlike the defendant in *Silfa*, in no way did Ms. Best recognize and appreciate the gaps in her comprehension of what self-representation entailed. While she "remained steadfast in wanting to represent herself," (maj. opn. at p. 14), her persistence in that desire does not establish that she " ' "actually . . . underst[ood] the significance and consequences" of the decision to waive counsel.' " (*Burgener, supra,* 46 Cal.4th at p. 243, quoting *People v. Stewart* (2004) 33 Cal.4th 425, 513.) Indeed, the majority's " 'construct conflates [defendant]'s determination to proceed pro se, with [her] understanding of the consequences of doing so.' " (See *Burgener*, at p. 243, quoting *United States v. Crawford* (8th Cir. 2007) 487 F.3d 1101, 1106.)

In asserting that *Silfa* "is on point," the majority relegates to a footnote and, in my view, improperly minimizes one more key difference between *Silfa* and this case: At no time did the defendant in *Silfa* misstate or misrepresent his criminal history and experience with self-representation when trying to convince the court to grant his *Faretta* motion. It is difficult to believe that Ms. Best was merely mistaken about the events, given her specific claims that the San Mateo case lasted from 2007 to 2012 and that she won the case. It is even more difficult to accept the majority's gloss on Ms. Best's claim that she had successfully represented herself for five years in a San Mateo case— i.e., that she merely "represented as true something she could not substantiate with independent evidence (e.g., her RAP sheet)." (Maj. opn. at p. 15, fn. 5.) The majority's benign view of Ms. Best's assertion as to her successful self-representation in San Mateo assumes without any evidentiary basis that the RAP sheet—which catalogs more than 50 arrests in three states and six different California counties (although not San Mateo)—is inexplicably missing a five-year case that ended in an acquittal. That

9

charitable take on Ms. Best's insistence that she had successfully represented herself also rests on speculation that she may have been telling the truth but simply lacked the documentary evidence to corroborate her claim. But the majority's credulous view of Ms. Best's statements is undermined by the fact that, in her effort to bamboozle the court into believing that she understood the consequences of her waiver, she had already misrepresented her understanding of the rights set forth on the *Faretta* waiver form: After Ms. Best asked the court whether "[t]here [was] a difference between a speedy trial and a jury trial" and the court stated that she would be expected to know the answer to such questions, Ms. Best asserted that, in fact, she "did know the answer to it," but then asked yet again what the difference was between a speedy trial and a jury trial. Ms. Best's repeated questions as to whether there was a difference between a speedy trial and a jury trial— sandwiched around her false insistence that she "did know the answer to [that question]"—demonstrate both her willingness to overstate her understanding of her rights and the court's legitimate concern that her waiver was not knowing and intelligent, despite the initials and checked boxes on the form.

The majority characterizes all of this as mere "bluster[]" and states that such behavior "does not vitiate her knowing and voluntary choice to self-represent." (Maj. opn. at p. 14, fn. 5.) But in so doing, I believe the majority misses the point. The point is not that Ms. Best was (or should be) punished for her misstatements by invalidating what was otherwise a knowing and voluntary choice. Rather, the point is that her willingness to misrepresent basic facts as to both her criminal history and her understanding of the rights set forth on the *Faretta* form supports the trial court's well-founded concern that she did not, in fact, knowingly waive her right to counsel with a true

10

understanding and appreciation of the consequences.  Suffice it to say that this case bears no resemblance to *Silfa*.

Even if the majority's reliance on *Poplawski* and *Silfa* were well founded, there is an independent basis on which I would affirm the denial of the *Faretta* motion.  (*People v. Dent* (2003) 30 Cal.4th 213, 218 (*Dent*) [where trial court denied self-representation request on an improper basis, the ruling may be affirmed if the record as a whole establishes it was properly denied on other grounds].)  A defendant's self-representation request may be denied where he or she engages in serious and obstructionist misconduct.  (*People v. Welch* (1999) 20 Cal.4th 701, 734–735 [trial court properly denied defendant's *Faretta* motion "based on the disruptive behavior he had exhibited in the courtroom"].)[3]  A court may also deny a *Faretta* motion where the defendant is unable or unwilling to "abide by rules of procedure and courtroom protocol."  (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 173.)  After all, the "right of self-representation is not a license to abuse the dignity of the courtroom."  (*Faretta, supra*, 422 U.S. at p. 834, fn. 46.)  To be sure, the trial court did not expressly state that it was basing its denial of the *Faretta* motion on defendant's repeated interruptions and vociferous insistence that she had previously proceeded pro se, despite the evidence contradicting her assertion.  It is nonetheless apparent from the record that the court was appropriately considering Ms. Best's disruptive behavior and obstructionist

---

[3] Notably, Ms. Best engaged in some of the same behavior as the defendant in *Welch*:  Both defendants turned their backs on the court and "interrupted the trial court several times to argue what the court had declared to be a nonmeritorious point."  (*Welch, supra,* 20 Cal.4th at p. 735.)  In addition, like the defendant in *Welch* who "accused the court of misleading him," Ms. Best accused the trial court of "mistreat[ing]" her and suggested that a denial of her motion would be in violation of her "rights under the universal declaration of human rights in order to be represented."  (*Ibid.*)

11

misconduct as a reason for its ruling—indeed, the court expressly focused on Ms. Best's inability to behave appropriately in the courtroom *in the middle of* explaining its denial of the *Faretta* motion: "The determination I am making is whether it is clear to me that you fully understand and appreciate the expectations that will be placed on you . . . if you represent yourself . . . . *And one of those expectations is that you not interrupt the Court. . . .* That you fully appreciate and understand the consequences that might occur were you to represent yourself. And I will tell you from our very limited conversation, *and my review of your RAP* [sheet], as well as your understanding of the [E]vidence [C]ode being contained inside the [P]enal [C]ode. . . . And that post-trial motions is [*sic*] similar to closing statements or a summary of the trial. [¶] I only asked a couple of specific things as related to a trial. Or that even not knowing the difference between a speedy trial and a jury trial. [¶] At this point, I am going to deny your request."[4]

The majority states, "*Dent* explains that we uphold a ruling made on an improper ground if the record shows the 'request *was* nonetheless properly denied on other grounds,' but it does not address requests that merely could have been denied on discretionary grounds. (*Dent, supra,* 30 Cal.4th at p. 218, italics added)." (Maj. opn. at p. 16.) To the extent the majority

_____

[4] The ellipses in this quotation omit only Ms. Best's interruptions of the court. It should be noted that almost immediately before the quoted statement, the trial court specifically commented that it had "been given a RAP sheet by the attorneys," and "did not find any reference in the RAP sheet to a trial that was conducted between 2007 and 2012 or any reference to an acquittal" in San Mateo or any county. Given that Ms. Best thereafter again insisted that her successful self-representation occurred in San Mateo and that the acquittal was indeed in the RAP sheet, one can reasonably infer that the court's subsequent reference to its "review of [the] RAP" refers to the court's previously expressed concern that Ms. Best had misrepresented her purportedly successful experience with self-representation.

12

suggests that an appellate court may only affirm the denial of a *Faretta* request if the trial court expressly relied on that basis below, *People v. Boyce* (2014) 59 Cal.4th 672 (*Boyce*) demonstrates that the majority's reading of *Dent* is unduly narrow.  In *Boyce*, the trial court denied the defendant's *Faretta* request during the penalty phase of trial, finding that the request was untimely and that the defendant was unqualified to represent himself due to his mental impairment and lack of education.  (*Boyce,* at pp. 701–702.) On appeal, the defendant argued the trial court erred by considering his lack of education as a basis to deny the *Faretta* request, failing to determine whether his request was knowing and intelligent, and failing to apply the appropriate factors to assess untimeliness.  (*Boyce,* at p. 703.)  The Supreme Court found, "We need not resolve these contentions, however, because 'the record as a whole establishes defendant's request was nonetheless properly denied on other grounds . . . .'  ([*Dent, supra*, 30 Cal.4th at p. 218].)  No Sixth Amendment violation occurred because defendant did not make an unequivocal demand to represent himself."  (*Boyce*, p. 703.)  Thus, although the trial court in *Boyce* did not deny the *Faretta* request based on a finding that it was equivocal, the Supreme Court independently reviewed the record, found the request to be equivocal, and followed *Dent* in holding that no *Faretta* violation had occurred.  (*Boyce,* pp. 701–705.)  *Dent* is therefore not, as the majority seems to suggest, limited to cases in which a trial court denies a *Faretta* motion on multiple explicit bases, one of which is unfounded but another of which would support affirmance.[5]

_____

    [5] In my view, the majority errs in attempting to explain away the import of *Boyce*.  This dissent's citation to *Boyce* is merely to demonstrate that the majority overstates *Dent*—to wit, *Dent* does not, as the majority seems to suggest, broadly proclaim that a denial of a *Faretta* motion may be affirmed only on an alternative basis on which the trial court explicitly relied.

13

I find no more persuasive the majority's reliance on *Bergin v. Portman* (1983) 141 Cal.App.3d 23, 27–28 (*Bergin*), which quoted *People v. Union Machine Co.* (1955) 133 Cal.App.2d 167, 171 (*Union Machine*). (Maj. opn. at p. 17.) In *Bergin*, the trial court dismissed an action for failure to prosecute

---

(Maj. opn. at p. 16 [under *Dent,* we uphold a ruling made on an improper ground if the record shows the " 'request *was* nonetheless properly denied on other grounds' "; further stating that *Welch* was affirmed because the trial court "*also* properly relied" on an alternative basis for denial].) So understood, whether the alternative basis in *Boyce* was a question of law or discretion is irrelevant to the proposition for which it is herein cited. Moreover, *People v. Halvorsen* (2007) 42 Cal.4th 379, 433–434, demonstrates the fallacy of the majority's position that *Dent* and *Boyce* are not on point here, purportedly because "the alternate grounds urged upon us are, not issues of law, but matters committed to the sound discretion of the trial court." (Maj. opn. at p. 17, fn. 6.) In a case that predated *Indiana v. Edwards* (2008) 554 U.S. 164, the *Halvorsen* Court found that the trial court erred by denying a *Faretta* motion on an "invalid" legal basis, "[defendant's] supposed mental incapacity not amounting to incompetency to stand trial." (*Halvorsen*, at p. 433.) The Supreme Court then cited *Dent* and went on to decide whether the *Faretta* motion nonetheless would have properly been denied on the basis of untimeliness, a matter " ' "addressed to the sound discretion of the court." ' " (*Halvorsen*, at pp. 433–434 & fn. 15 ["Even when the trial court does not state it is denying a *Faretta* motion on the ground of untimeliness, we independently review the record to determine whether the motion would properly have been denied on this ground. (*[Dent, supra*, 30 Cal.4th at pp. 218, 222.]"].) Although the Supreme Court ultimately found the motion to be timely (*Halvorsen*, at p. 434), that determination is irrelevant to the point made here: If, as the majority posits, *Dent* stands narrowly for the twin propositions that denial of a *Faretta* motion may be upheld only on an alternative basis expressly relied on by the trial court, and only one that is based on a question of law as opposed to discretion, *Halvorsen* would not have followed *Dent* to determine whether the denial was proper on the discretionary ground of untimeliness, an inquiry the Court specifically found necessary to its resolution of the matter. (*Halvorsen*, at p. 434 & fn. 15 [the fact that the trial court's "stated basis" for its denial was invalid "[did] not end the matter," as timeliness had to be considered even if the trial court did not deny the motion for that reason].)

14

based on its reading of Code of Civil Procedure section 583, subdivision (c). (*Bergin*, at p. 25.) The appellate court held that the trial court erred in its construction of section 583 and, as a result, improperly dismissed the action. (*Bergin*, at p. 26.) The respondent argued that even if the trial court had erred in its analysis of section 583, "the judgment of dismissal should be upheld on the ground that the trial court had the power to dismiss for lack of diligent prosecution independent of the provisions of section 583," and that the trial court's decision could not be overturned absent a manifest abuse of discretion. (*Bergin*, at p. 27.) The *Bergin* court rejected this contention, noting that the trial court's decision was "based *exclusively* on section 583 without reference to any 'independent basis' for the ruling," and that there was "*no indication* that the trial court exercised its discretion in dismissing the action, much less that it considered" any discretionary basis for dismissal. (*Ibid.* at pp. 27–28, italics added.)

Similarly, in *Union Machine*, the trial court restricted cross examination of an expert on property valuation on the erroneous basis that the questions were not permitted "because it had been shown that the expert had not learned of" the purchase offers at the heart of the proposed questions. (*Union Machine, supra*, 133 Cal.App.2d at p. 171.) Because the trial court's challenged rulings were "clearly made as matters of law, of admissibility, not as matters of discretion," the trial court rejected the respondent's arguments that the judgment could be affirmed on the alternative bases that the trial court had discretionary power to limit unreasonable cross-examination, or that the trial court could have barred the questions based on the belief that the "real purpose" of the questions was to prove market value, which was not permitted. (*Ibid.* at pp. 171–172.) In so ruling, the court noted that "there is *no indication in the record*" that the bases suggested by the respondent were

15

considered by the trial court, "the only ground given being that the expert did not know of the offers." (*Ibid.* at p. 172, italics added; see also *ibid.* at p. 171 ["the record shows that [limiting unreasonable cross-examination] was not the basis of the court's decision"].)  Thus, to the extent these cases can be extended to our review of the denial of a *Faretta* motion (notwithstanding *Dent*), *Bergin* and *Union Machine* stand only for the proposition that a ruling made "exclusively" on a legal basis cannot be sustained on an alternative discretionary basis concocted by a respondent when the record reflects "no indication" that the court even considered such a reason for its ruling. (*Bergin, supra*, 141 Cal.App.3d at pp. 27–28; see also *Union Machine, supra,* 133 Cal.App.2d at p. 172.)

In relying on *Bergin* and *Union Machine*, the majority fails to recognize that the record in this case shows every indication that the court expressly considered Ms. Best's disruptive and inappropriate courtroom behavior (i.e., her repeated interruptions and baseless claim of prior successful experience with self-representation) in making its ruling.  Again, a full quotation of the record—omitting only Ms. Best's interruptions and other comments— demonstrates that the court's ruling was not "based exclusively" on what the majority deems an erroneous focus on Ms. Best's lack of legal knowledge. (*Bergin, supra*, 141 Cal.App.3d at pp. 27–28; maj. opn. at pp. 16–17.)[6]  The

---

[6]  In explaining its ruling, the trial court began as follows: "Is there anything else that you want to tell me—before I make my ruling on your request to represent yourself? . . .  All right.  So at this point, I appreciate that you want to represent yourself.  I have both read and considered the waiver of right to counsel form.  *I have been given a RAP sheet by the attorneys.  I will tell you that I did not find any reference in the RAP sheet to a trial that was conducted between 2007 and 2012 or any reference to an acquittal.*"  After the defendant insisted that the RAP sheet did show her successful self-representation San Mateo and reiterated her desire to

record in this case thus demonstrates that, unlike *Bergin* and *Union Machine*, the trial court did not "exclusively" ground its ruling on unsound legal footing. Rather, in denying the *Faretta* motion, the court specifically pointed to Ms. Best's inappropriate behavior with respect to interruptions, her false representations as to her purported self-representation in a prior San Mateo case, *and* the statements showing her failure to comprehend the basics of self-representation. Thus, even assuming the majority were correct that the trial court inappropriately considered Ms. Best's lack of legal knowledge, *Bergin* and *Union Machine* are distinguishable because a fulsome reading of the record in this case reveals that the court's ruling was not "based exclusively" on an impermissible rationale; instead, the ruling was based on multiple, intertwined reasons, including Ms. Best's interruptions and misrepresentations as demonstrated by her RAP sheet.

---

represent herself because she was "competent enough" and wanted to "get the proper outcome in [her] case," the court continued its ruling: "I hear that [you want to represent yourself]. And I will tell you that I did see from the docket that you were recently—a doubt was declared as to your competence, and it was determined that you are competent to proceed to trial. And I'm not making a determination today whether or not you are competent to proceed to trial. The determination I am making is whether it is clear to me that you fully understand and appreciate the expectations that will be placed on you . . . if you represent yourself . . . . *And one of those expectations is that you not interrupt the court*. . . . That you fully appreciate and understand the consequences that might occur were you to represent yourself. And I will tell you from our very limited conversation, *and my review of your RAP*, as well as your understanding of the [E]vidence [C]ode being contained inside the [P]enal [C]ode. . . . And that post-trial motions is [*sic*] similar to closing statements or a summary of the trial. [¶] I only asked a couple of specific things as related to a trial. Or that even not knowing the difference between a speedy trial and a jury trial. [¶] At this point, I am going to deny your request." (Italics added.) The ellipses in the foregoing quotation omit only Ms. Best's interruptions of the court.

In my view, Ms. Best's interruptions—even after being admonished not to interrupt—and heated persistence with her false claim that she had successfully represented herself in a San Mateo case that lasted 5 years—despite being told that the RAP sheet contained no reference to any such case—provide an additional and independent basis on which to affirm the trial court's denial of the *Faretta* motion. (See *Dent, supra*, 30 Cal.4th at p. 218 [even if self-representation request was denied on an improper basis, the ruling may be affirmed "if the record as a whole" establishes it was properly denied on other grounds].)

In short, I must part ways with the majority, as I conclude that the record as a whole reflects the trial court's explicit and appropriate concern with Ms. Best's unwillingness to abide by courtroom protocol as well as her statements demonstrating that she did not fully appreciate the dangers and disadvantages of self-representation, with her " 'eyes open' " to the consequences of waiver. (*Faretta, supra,* 422 U.S. at p. 835.) I would affirm the denial of the *Faretta* motion.

## Conclusion

In my view, the majority errs in analyzing this case as one in which the trial court denied Ms. Best's self-representation request because the trial court was improperly focused on her lack of technical legal knowledge. I believe the record instead reflects that the court appropriately assessed whether Ms. Best's waiver was indeed knowing and intelligent, with full awareness of the rights she claimed to understand and the consequences of proceeding pro se. Because I believe the trial court correctly found that the waiver was not knowing and intelligent, and because the record additionally demonstrates the court's reliance on Ms. Best's significant disruptions and

18

lack of candor as additional reasons for denying the *Faretta* motion, I would affirm the ruling.  With respect, I dissent.

_____

BROWN, J.

Trial Court:                 City & County of San Francisco Superior Court

Trial Judge:                 Hon. Charles S. Crompton

Counsel for Appellant:       Kevin B. King, by appointment of the Court of
                             Appeal under the First District Appellate
                             Assisted Case System

Counsel for Respondents:     Xavier Becerra, Attorney General; Jeffrey M.
                             Laurence, Senior Assistant Attorney General;
                             Catherine A. Rivlin, Supervising Deputy
                             Attorney General; Ann P. Wathen, Deputy
                             Attorney General